**Jeffrey ARMSTRONG Plaintiff,**

v.

**Janet RENO, Defendant.**

**No. 98–1642 (EGS).**

United States District Court, District of Columbia.

Sept. 14, 2001.

13

Michael J. Kator, Esq., Laura A. Stefani, Esq., Kator, Parks & Weiser, P.L.L.C., Washington, DC, for Plaintiff.

Mark E. Nagle, Daria Jean Zane, U.S. Attorney's Office, Heather J. Kelly, Esq., United States Attorney's Office, Civil Division, Washington, DC, for Defendant.

## MEMORANDUM OPINION AND ORDER

SULLIVAN, District Judge.

Plaintiff Jeffrey Armstrong brought this action alleging that his former employer, the Drug Enforcement Administration ("DEA") discriminated against him on the basis of his race and disability, created a hostile working environment, failed to provide reasonable accommodation for his disability, and retaliated against him for filing Equal Employment Opportunity ("EEO") complaints, in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* ("Rehabilitation Act") and Title VII of the Civil Rights Act of 1964 (as amended), 42 U.S.C. § 2000e *et seq.* ("Title VII").

Pending before the Court is defendant's motion for summary judgment. Defendant argues the following: first, that many of plaintiff's allegations are barred because he failed to exhaust administrative remedies; second, plaintiff's race and disability discrimination and retaliation claims fail because plaintiff has not proven that he suffered an adverse employment action; third, plaintiff's remaining discrimination claims fail because he can not overcome defendant's legitimate, non-discriminatory rationale for defendant's actions; fourth, plaintiff's reasonable accommodation claim fails because he did in fact receive the requested accommodation once DEA was informed of the plaintiff's medical need; and fifth, plaintiff's hostile work environment claim fails because plaintiff was "hypersensitive" and cannot prove the existence of objectively hostile or abusive conditions.

Upon consideration of the defendant's motion, the opposition and reply thereto, as well as relevant statutory and case law, defendant's motion is **DENIED**.

## BACKGROUND

### I. *Plaintiff's DEA Employment History*

Plaintiff Jeffrey Armstrong, a 38–year-old African–American male, joined the U.S. Air Force in 1979 and remained active for eight years. He was honorably discharged in 1987 following a service-incurred injury to his knees that required surgical repair. Doctors have assessed his disability at a rating of 30% or more. Plaintiff's injury impairs his knees, back, and neck and affects his ability to walk and stand. Specifically, plaintiff experiences pain and numbness in his knees because of nerve damage, for which he takes muscle relaxants and pain killers. Because of his disability, plaintiff has had handicapped license tags on his car since 1989. Pl.'s Mem. of P & A in Opp'n to Def.'s Mot. for Summ. J. (hereinafter "Pl.'s Opp'n") at 2–3.

Plaintiff claims that his disability impacts his ability to do certain types of work. After his discharge from the Air Force, he had to give up a position as a file clerk at the Department of Energy because of the physical strain. Pl.'s Opp'n at 3.

In 1989, plaintiff joined the Drug Enforcement Administration as part of a special placement program. The parties dispute whether the special placement program was for disabled veterans, or generally for persons with disabilities. *Compare* Def.'s Mem. in Support of Def.'s Mot. for Summ. J. (hereinafter "Def.'s Br.") at 2 *with* Pl.'s Opp'n at 3. Plaintiff contends that when he was hired, he gave DEA Personnel a copy of his Veterans' Administration ("VA") disability rating

sheet and filled out a form that listed the physical activities he could not perform. Pl.'s Opp'n at 3. However, Defendant claims that the management at the Washington Division Office ("WDO") where plaintiff worked was unaware of his disability rating or physical impairments. Def.'s Br. at 2.

The parties agree that for several years, plaintiff performed his duties at levels consistently assessed as "excellent" and worked his way from a G–4 salaried position to a G–12 position as a Telecommunications Specialist in the Technical Operations Group at the WDO. Plaintiff claims that from the beginning of his time at DEA, he was given accommodations for his disability. Pl.'s Opp'n at 4. Plaintiff claims that he was allowed to park in a parking spot that minimized walking. *Id.* Plaintiff claims that one of his initial supervisors, Administrative Officer ("AO") Juanita Matthews, had in place a lifting restriction for him. *Id.* In addition, plaintiff claims that he was allowed to take his lunch hour from 2 p.m. to 3 p.m. so that he could use a particular gym for his medically-required exercises. *Id.* Until 1995, plaintiff claims that he had no problem parking in his desired spot or taking the late lunch. *Id.* Defendant contests these facts, claiming that plaintiff never requested or received a disability accommodation before 1995. Def.'s Br. at 2.

In 1991, plaintiff filed an EEO complaint against Assistant Special Agent in Charge ("ASAC") Ferris, alleging racial discrimination. While that complaint was settled, plaintiff alleges that his filing an EEO complaint was not well received at the WDO. Pl.'s Opp'n at 4—5.

In 1995, plaintiff was informed that he was being transferred from the Technical Operations Group to the Administrative Section under AO Alvin Jenkins. Plaintiff claims that this transfer was improper.

He claims that when he asked why he was being transferred, Group Supervisor ("GS") Michael Burke told him that the front office did not like plaintiff because he was intimidating, "uppity, too cocky, and was lucky to be a GS–12." Pl.'s Opp'n at 5. Defendant contests this claim. Defendant explains that plaintiff was transferred because Special Agent in Charge ("SAC") Peter Gruden conducted an analysis and determined that the Administrative Section needed a full time Security Specialist to handle security matters that would accompany an upcoming office relocation. Def.'s Br. at 2–3. He consequently decided to reclassify one Telecommunications Specialist position to a Security Specialist, and chose plaintiff to fill that role. *Id.* at 2.

In September, 1995, plaintiff was transferred to the Administrative Section at WDO under the supervision of AO Jenkins. Plaintiff alleges that from the start AO Jenkins prevented him from doing his work by denying him access to government vehicles, instructing plaintiff not to leave the building, and refusing plaintiff adequate training for his new position. Pl.'s Opp'n at 6. Defendant, on the other hand, claims that plaintiff from the start became a problem for AO Jenkins by refusing to comply with orders. Def.'s Br. at 3. Defendant claims that plaintiff failed to meet his supervisor's instructions and needed counseling as a result. *Id.*

In October 1995, plaintiff's lunch hour became an issue in dispute between plaintiff and AO Jenkins. The parties differ as to the order of events. Plaintiff alleges that as he had been receiving the late lunch accommodation all along, it was AO Jenkins who notified plaintiff that he would have to change his lunch hours. Pl.'s Opp'n at 6. In response, claims the plaintiff, he wrote a memo to AO Jenkins explaining the need for the late lunch. *Id.*

In addition, plaintiff alleges that his co-workers were not restricted in their lunch hours. *Id.* at 7. Plaintiff also alleges that he spoke with AO Jenkins, ASAC Wilson, and SAC Gruden about his disability, but they all denied his request. *Id.* Defendant, on the other hand, contends that the October of 1995 memo was the first time plaintiff ever requested an accommodation for his disability. Defendant's Brief at 4. Defendant denies that SAC Gruden was made aware of this request. *Id.* Defendant contends that AO Jenkins sent plaintiff a responding memo requesting medical documentation supporting his disability claim. *Id.* Defendant claims that plaintiff failed to provide that documentation until September 1996. *Id.*

In December 1995, plaintiff's parking space became an issue. Plaintiff claims that in December 1995, SAC Gruden instructed the parking garage manager to make plaintiff move his car. Pl.'s Opp'n at 7. Plaintiff then met with SAC Gruden and informed him of his need for a handicapped parking space. *Id.* Defendant claims that SAC Gruden noticed a car parked improperly in the garage and questioned AO Jenkins about it. Def.'s Br. at 5. Defendant admits that SAC Gruden spoke with plaintiff about the parking space and requested medical documentation. *Id.* Plaintiff claims that he then showed SAC Gruden his handicapped parking permit in response to that request. Pl.'s Opp'n at 7.

AO Jenkins requested assistance in resolving the parking space dispute from the DEA Office of Personnel. Once again, the parties dispute what happened next. Plaintiff alleges that Sharon Taylor Foreman investigated plaintiff's parking space request in December of 1995. Pl.'s Opp'n at 8. Ms. Foreman informed plaintiff that any further accommodation requests should go through her. *Id.* Plaintiff claims

that in early 1996, he provided Ms. Foreman with copies of his medical records, from both the VA and his private physicians. *Id.* Defendant, on the other hand, claims that SAC Gruden and AO Jenkins were given conflicting information from the Personnel Office with respect to plaintiff's disability. Def.'s Br. at 5. Defendant claims that Personnel initially responded that it had no information related to plaintiff's disability. *Id.* Then, on January 30, 1996, the head of Personnel, Retha Fulmore, advised AO Jenkins that plaintiff should be given a special parking spot to "accommodate his disability." *Id.*

Defendant does not dispute the fact that after the January 30, 1996, letter from the head of Personnel, it did not provide plaintiff with his accommodation. *Id.* Instead, defendant claims that it consulted with DEA's EEO officer, Marion Moss, as to the proper course of action. *Id.* Defendant claims that plaintiff's failure to provide medical documentation until September of 1996 prevented it from providing the parking space. *Id.*

Plaintiff, on the other hand, contests this version of events. Plaintiff claims that after receiving his medical documents, Ms. Foreman attempted to meet with AO Jenkins to discuss the matter from January through September 1996 but was rebuffed. Pl.'s Opp'n at 8. Plaintiff alleges that Ms. Foreman both informed SAC Gruden that AO Jenkins would not meet with her, and also forwarded plaintiff's medical documents to both AO Jenkins and another supervisor, R.C. Gramble, in April of 1996. *Id.* Defendant contests this version of events, and characterizes plaintiff's discussions with Ms. Foreman as an attempt to "bypass the system" and blames Ms. Foreman for failing to provide WDO management with information related to plaintiff's disability. Def.'s Br. at 6 n. 8. Plaintiff alleges that he was unaware that he should

discuss his request with anyone other than Ms. Foreman until fall of 1996, and when he was so informed, he did so promptly. Pl.'s Opp'n at 8.

Defendant claims that accommodation requests are processed through DEA's Medical Health Unit and the Chief Medical Officer, Dr. Gary Schwartz. Def.'s Br. at 6. Plaintiff agrees that it was not until September of 1996 that he approached Dr. Schwartz. Dr. Schwartz did receive plaintiff's accommodation request for a parking space, ergonomic chair, and a late lunch hour, along with medical documents from the VA and plaintiff's personal physicians. *Id.* Upon review of plaintiff's documentation, Dr. Schwartz recommended that plaintiff's accommodation requests be granted. *Id.* Defendant admits that one of the forms reviewed by Dr. Schwartz was a Statement of Physical Ability for Light Duty Work which plaintiff had completed when he was hired by DEA 1989 which discusses plaintiff's physical limitations. *Id.*

Defendant claims that in September of 1996, after receiving a recommendation that plaintiff should receive the three accommodations he requested, SAC Gruden made arrangements to grant two of the requests, the parking space and the chair. Def.'s Br. at 7. It is unclear when plaintiff actually received those accommodations. Defendant claims that the late lunch request was made moot by the fact that the gym used by plaintiff had closed by September of 1996. *Id.*

The parties agree that in the meantime, in February of 1996, AO Jenkins requested that plaintiff help move some furniture. Pl.'s Opp'n at 9; Defendant's Brief at 7. Plaintiff claims that he refused, citing his disability. Pl.'s Opp'n at 9. Plaintiff alleges that AO Jenkins then gave him a direct order to move the furniture. *Id.* Plaintiff sustained injuries to his back moving the furniture and was required to take medical leave. *Id.* The parties dispute what happened next. Plaintiff claims that he timely filled out the proper leave and workers' compensation forms, but AO Jenkins failed to timely fill out the required paperwork, resulting in a delay of three months before plaintiff received his workers compensation payment. *Id.* Defendant alleges that plaintiff informed AO Jenkins that he injured his back and submitted a leave slip, but then was absent for the rest of the week without any further notice. Def.'s Br. at 7. Defendant alleges that this incident began what Defendant calls plaintiff's pattern of "leave abuse." *Id.*

Defendant alleges that on many occasions after injuring himself in February of 1996, plaintiff left work without notifying AO Jenkins. *Id.* He frequently left leave slips with AO Jenkins at the end of one day for medical appointments to occur the next. *Id.* Defendant claims that it was difficult for AO Jenkins to schedule work for plaintiff, and as a result, on August 8, 1996, AO Jenkins placed plaintiff on leave restriction. *Id.* The restriction required plaintiff to receive supervisory approval prior to taking medical leave, and to support absences with a doctor's certificate. *Id.* Defendant claims that in August and September plaintiff did not sufficiently comply with the leave restriction, resulting in both his being placed on AWOL status for one absence, and an increased leave restriction imposed on September 23, 1996. *Id.* The new restriction required notice of the precise time for doctor's appointments. *Id.* Plaintiff disputes that any of his absences occurred without proper notice and claims that the AWOL status was improper and the leave restrictions were discriminatory and retaliatory. Pl.'s Opp'n at 10.

Plaintiff eventually requested a transfer away from AO Jenkins' supervision. Defendant alleges that plaintiff requested to

be transferred from AO Jenkins' supervision to the Security Programs Office at DEA Headquarters. In a November 7, 1996, letter to Dr. Schwartz, plaintiff requested this reassignment and attached a letter from his personal physician stating that he should be transferred because of the harassment-related stress plaintiff was suffering at work. *Id.* Dr. Schwartz concluded that plaintiff should be transferred if evidence supported the harassment claim. *Id.* ASAC R.C. Gamble, who had recently arrived at the WDO, decided to deny plaintiff the transfer to DEA Headquarters for two reasons: first, he concluded no harassment was occurring; and second, because plaintiff was a GS-12 and the position at Headquarters was a GS-13, the transfer was improper. *Id.*

ASAC Gamble did decide to grant plaintiff's request to be transferred away from AO Jenkins. On February 7, 1997, plaintiff was transferred back to the Technical Operations Group, where he was under the supervision of GS Washington, and ASAC Gamble. Plaintiff alleges that his difficulties with his supervisors and difficulties in getting leave approved continued after his transfer. Pl.'s Opp'n at 10–11. Defendant alleges that plaintiff's performance and attendance continued to be problematic. Def.'s Br. at 10.

On one occasion in particular, plaintiff experienced chest pains at work and required transportation to the hospital. Plaintiff alleges that when GS Washington entered plaintiff's office for a meeting, plaintiff informed him of the chest pains. Plaintiff alleges that GS Washington then responded that he did not care and that if plaintiff left the office he would be written up for insubordination. Pl.'s Opp'n at 11. Defendant claims that GS Washington entered plaintiff's office to discuss plaintiff's problematic attendance and performance, and that plaintiff requested transportation

to the hospital only after GS Washington informed him to report to ASAC Gamble's office to discuss his behavior. Def.'s Br. at 10. Defendant acknowledges that the pain was determined to have been caused by muscle spasms in plaintiff's chest. *Id.* Defendant also alleges that plaintiff had alleged chest pains on a prior occasion, the same day AO Jenkins placed plaintiff on restricted leave. Plaintiff also required transportation to the hospital on that occasion. *Id.* at 10 n. 12.

Plaintiff claims that on one occasion he wrote a memo to GS Washington complaining of his lack of training for the duties of his position. Plaintiff claims that when they met to discuss the memo, GS Washington lost his temper and told him, "I don't need your fucking lawsuit," and "get the fuck out of [my] office and the Tech Ops section." *Id.* at 12. Plaintiff claims he reported GS Washington's behavior to ASAC Gamble, who found it amusing. *Id.* Defendant admits that GS Washington became upset with plaintiff, and "addressed plaintiff in tone that conveyed his displeasure with plaintiff's failure to [complete his work]." Def.'s Br. at 12.

Defendant lists several alleged problems with plaintiff's performance after his transfer back to the Technical Operations Group. Defendant claims that plaintiff "became increasingly argumentative and often failed to complete assignments in a timely manner." *Id.* at 10. Because of plaintiff's alleged excessive leave, ASAC Gamble reinstated plaintiff's leave restrictions on October 30, 1997. *Id.* at 11. Defendant claims that on two occasions in particular, in November and December of 1997, plaintiff chose to take leave rather than complete important assignments. The November incident involved an assignment to photograph WDO employees for a new security system. Defendant claims

that as a result of plaintiff's failure to perform this assignment, GS removed plaintiff's responsibility for implementing the new security system. *Id.* at 11.

The December incident precipitated plaintiff's leaving DEA for an extended period of time. Defendant claims that plaintiff was responsible for distributing a set of keys to DEA employees on December 12, 1997. Def.'s Br. at 12. Plaintiff, however, had scheduled annual leave that day to pick up his family from the airport. Defendant alleges that plaintiff refused to take responsibility for the assignment and chose to take the leave instead. *Id.* Because plaintiff made no effort to resolve the conflict, ASAC Gamble canceled plaintiff's annual leave and assigned him AWOL status for December 12. *Id.*

After December 12, 1997, plaintiff did not return to DEA. *Id.* Plaintiff claims that he was on medical leave, necessitated by increased nerve pain and muscle spasms associated with work-induced stress. Pl.'s Opp'n at 12. Plaintiff claims that he submitted the proper documentation from his doctor informing DEA of his need for medical leave. *Id.* Defendant claims that ASAC Gamble allowed plaintiff to exhaust his existing leave balance prior to placing plaintiff on AWOL status. *Id.* Once DEA received documentation from plaintiff's doctor, ASAC Gamble granted 30 days of Leave Without Pay ("LWOP") to replace 30 days of AWOL that had been assessed through February 27, 1998. *Id.* at 13. On June 30, 1998, the DEA Office of Personnel gave final approval for plaintiff's LWOP request for February 27, 1998 through December 31, 1998. *Id.* at 13. Plaintiff claims that as of February 17, 1998 he was assessed 168 hours of AWOL.[1]

Plaintiff alleges during this time that he began to search for jobs outside of DEA. Pl.'s Opp'n at 13. Plaintiff returned to work at DEA briefly in early 1999 before resigning. Def.'s Br. at 13. Plaintiff is currently employed as a GS–12 Security Manager for Federal Emergency Management Agency in Meynard, Massachusetts. Pl.'s Opp'n at 2.

## II. *DEA's Administrative EEO Process*

Plaintiff filed an initial formal EEO Complaint on April 23, 1996, because of WDO management's failure to provide his requested disability accommodations. *See* Def.'s Mot. to Dismiss, Ex. A (indicating that first contact with the EEO office was on March 13, 1996). He filed several other EEO complaints subsequent to that initial complaint, dated October 25, 1996, April 23, 1997, December 17, 1997, and May 7, 1998. *See* Def.'s Mot. to Dismiss, Ex. B,C,D,E. In these subsequent complaints, plaintiff raised claims of racial and disability discrimination, failure to provide reasonable accommodation, and retaliation.

Plaintiff alleges that subsequent to his EEO complaints, his supervisors often raised the issue of his EEO complaints with him. Pl.'s Opp'n at 10. Furthermore, plaintiff claims that management also directed plaintiff's co-workers to stay away from him because of his EEO complaints. *Id.*

DEA never formally resolved these EEO complaints. Plaintiff filed this lawsuit on June 26, 1998.

## DISCUSSION

As the above discussion of the facts makes clear, this case is fraught with genuine factual disputes. Despite all the con-

---

1. The significance of the February 17, 1998 date is unclear from plaintiff's brief. Also, it is unclear whether plaintiff agrees that the

AWOL hours were eventually remedied by his leave request that according to defendant, was approved on June 30, 1998.

tested facts, defendant claims that none of these disputes are material to the claims at issue. With respect to each of plaintiff's claims, defendant is incorrect. There are genuine issues of material facts that preclude summary judgment with respect to plaintiff's allegations of race and disability discrimination, hostile work environment, failure to reasonably accommodate plaintiff's disability, and retaliation for filing EEO complaints. Defendant is correct, however, that plaintiff's claim of constructive discharge, alleged for the first time in plaintiff's opposition to defendant's motion for summary judgment, should be dismissed because it was not alleged in plaintiff's complaint.

## I. Standard of Review

Summary judgement should be granted only if the moving party has shown that there is no genuine issue of material fact and that the moving party is entitled to judgement as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Aka v. Washington Hosp. Ctr.*, 116 F.3d 876, 879 (D.C.Cir.1997). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## II. Exhaustion of Administrative Remedies

When denying defendant's motion to dismiss, this Court rejected defendant's argument that plaintiff failed to exhaust administrative remedies. *See* Mem. Op. and Order (March 3, 1999). Defendant's argument then rested on several grounds, which it now repeats in its motion for summary judgment. While the Court is not inclined to revisit this issue, defendant's arguments are without merit.

Defendant's exhaustion argument is essentially that some of the incidents of which plaintiff complains in this suit occurred too early, and some occurred too late. Defendant argues first, that any allegedly discriminatory incidents that occurred prior to January of 1996 are barred because plaintiff did not consult with an EEO counselor within 45 days of the incident, as required by 29 C.F.R. § 1614.105(a)(1). Second, defendant argues that the events described in plaintiff's May 7, 1998, EEO complaint are barred because plaintiff did not wait 180 days after filing that complaint before bringing this suit. Defendant's first argument fails because the continuing violation doctrine allows a complainant to reach back to incidents that occur prior to the 45 days before his first complaint. Defendant's second argument fails because plaintiff did timely raise every claim with the DEA that he has raised here. Furthermore, the incidents described in his May 7, 1998, EEO Complaint would have logically arisen in the course of DEA's investigation of plaintiff's five EEO complaints, had they actually completed an investigation. *See, e.g., Sanchez v. Standard Brands*, 431 F.2d 455 (5th Cir.1970).

Generally, exhaustion of administrative remedies is a prerequisite to relief under Title VII and the Rehabilitation Act. *Bayer v. U.S. Dept. of Treasury*, 956 F.2d 330, 332 (D.C.Cir.1992). To properly raise a claim under Title VII, a federal employee must contact an EEO counselor within 45 days of the plaintiff's notification of the allegedly discriminatory event. *Park v. Howard University*, 71 F.3d 904, 907 (D.C.Cir.1995); 42 U.S.C. § 2000e–16(c); 29 C.F.R. § 1614.105(a)(1). This 45–day time limit is not jurisdictional, but operates as a statute of limitations defense. *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982).

Thus, the burden is on the defendant to prove that administrative remedies were not exhausted. *Bowden v. United States,* 106 F.3d 433, 437–438 (D.C.Cir.1997); *Brown v. Marsh,* 777 F.2d 8, 13 (D.C.Cir. 1985). If the defendant meets its burden, the plaintiff then bears the burden of pleading and proving facts supporting equitable avoidance of the defense. *Bowden,* 106 F.3d at 437–38; *cf.* 29 C.F.R. § 1613.214(a)(4) (1991) (recodified as amended at 29 C.F.R. § 1614.204(c)). Importantly, the exhaustion requirement is subject to the doctrines of waiver, estoppel, and equitable tolling. *Zipes,* 455 U.S. at 385, 102 S.Ct. 1127; *Mondy v. Sec'y of the Army,* 845 F.2d 1051, 1055 (D.C.Cir. 1988); *M.K. v. Tenet,* 99 F.Supp.2d 12,25 (D.D.C.2000).

■ Defendant has not met its burden of proving that plaintiff failed to exhaust his administrative remedies. Plaintiff first filed an EEO complaint related to this case in March of 1996. The events of which he complains in this case that occurred prior to January 1996,[2] and through the entirety of his employment with DEA, are part of a continuing violation that plaintiff has alleged amounts to racial and disability discrimination, failure to reasonably accommodate his disability, and creation of a hostile work environment. Events that occur prior to the 45 day time-frame may be included in a Title VII claim under a continuing violation theory if they constitute "an ongoing series of related discriminatory acts directed against an employee... If at least one of the acts complained of falls within the limitations period, a complaint filed at any time within this period is timely filed with respect to all acts which are part of the continuing violation."

*Fisher v. Sullivan,* EEOC Appeal No. 01893987, 1990 WL 1113435 (E.E.O.C. January 18, 1990) (citations omitted); *see also Sabree v. United Brotherhood of Carpenters and Joiners Local No. 33,* 921 F.2d 396, 400 (1st Cir.1990); *Scott v. Claytor,* 469 F.Supp. 22, 25 (D.D.C.1978).

This Court is of the opinion, that if events occurred as plaintiff has alleged, then plaintiff was arguably subject to an ongoing series of discriminatory acts at the hands of the same few supervisors, beginning in 1995 and continuing until he resigned from DEA in 1999. Plaintiff made five formal complaints to DEA regarding this ongoing series of events from 1996 through 1998. The events of which plaintiff complained in the May 7, 1998, EEO complaint are simply a continuation of the events about which plaintiff had complained in the past. Those five complaints, which DEA never resolved, are sufficient to exhaust plaintiff's administrative remedies.[3]

### III. Race and Disability Discrimination Claims

#### A. *Plaintiff's Prima Facie Case*

As this court held in denying defendant's motion to dismiss, plaintiff has sufficiently alleged a prima facie case of discrimination based on race and disability. Once again, defendant argues that plaintiff's claim fails because he has not proven that he suffered any adverse employment actions. Def.'s Brief at 20.

■ In order to establish a prima facie case of discrimination under Title VII, a plaintiff must "establish that (1) she is a member of a protected class; (2) she suffered an adverse employment action; and

---

2. Forty-five days prior to his March of 1996 complaint.

3. Because the Court holds that the plaintiff has exhausted his administrative remedies, we do not need to address plaintiff's waiver or equitable tolling arguments.

(3) the unfavorable action gives rise to an inference of discrimination." *Brown v. Brody*, 199 F.3d 446, 452 (D.C.Cir.1999) (*citing McDonnell Douglas v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). Here, as the Court previously held, the plaintiff satisfies the first requirement. *See* Mem. Op. and Order (March 3, 1999).

■ In *Russell v. Principi*, the D.C. Circuit clarified the standard for adverse employment action required for a Title VII prima facie case. 257 F.3d 815 (D.C.Cir. 2001). In that case the Circuit held that the denial of a bonus can constitute an adverse employment action. 257 F.3d at 817. The determination of whether or not a plaintiff has suffered a sufficiently adverse employment is a fact-based question, and turns on whether the action " 'affect[s] the terms, conditions, or privileges of [an employee's] employment or future employment opportunities such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm.' " 257 F.3d at 818–19 (quoting *Brown*, 199 F.3d at 457).

■ Plaintiff alleges that his reassignment from Technical Operations to the Administrative Section and the resulting change in the terms and conditions of employment, lowered performance evaluations, leave restrictions, repeated assignment of AWOL status, and unpaid leave for one year are sufficiently adverse actions to satisfy the prima facie requirement. After *Russell*, this Court should not hold as a matter of law that those types of actions are *per se* not adverse employment actions. Whether or not the allegedly discriminatory actions taken by DEA against plaintiff, were sufficiently adverse is a question for a "reasonable trier of fact" to "objectively" determine. 257 F.3d at 818. Because the parties dispute the impact and importance of these DEA

actions, summary judgment is inappropriate as to plaintiff's race and disability discrimination claims.

### B. Defendant's Legitimate Non–Discriminatory Justifications.

■ Furthermore, while defendant has offered legitimate non-discriminatory justifications for the actions taken by DEA with respect to plaintiff, plaintiff has offered evidence that raises issues of material fact with respect to those justifications. For example, whether or not the decisions by AO Jenkins and GS Gamble to impose leave restrictions on plaintiff were motivated by discriminatory intent based on plaintiff's race and/or disability is a matter for a jury to decide. Plaintiff has offered evidence that his supervisors were hostile to his disabled status, and that evidence is sufficient to raise a question of material fact with respect to the motivation of those supervisors in making decisions that affected plaintiff's employment. As this Court's recitation of the facts in this case makes clear, the parties dispute the reason for almost every action taken by DEA with respect to plaintiff's employment; the Court will not repeat all those factual disputes here.

### IV. Reasonable Accommodation Under Rehabilitation Act

As this Court explained in responding to defendant's motion to dismiss, plaintiff has stated a claim under the Rehabilitation Act for DEA's failure to reasonably accommodate his disability. Mem. Op. and Order (May 3, 1999). Defendant now argues that it is entitled to summary judgment because plaintiff was eventually provided the accommodations he requested. Def.'s Mem. in Reply to Plf.'s Opp. to Mot. for Summ. J. ("Def.'s Reply Brief") at 3.

To prevail on a claim under the Rehabilitation Act, a plaintiff must prove that (1) he is disabled within the meaning of 29 C.F.R. § 1614.203(a), (b); (2) he is otherwise qualified; (3) his employer was aware of his disability; and (4) he was denied a reasonable accommodation for the disability. *Carr v. Reno,* 23 F.3d 525, 529 (D.C.Cir.1994). The Rehabilitation Act was amended to adopt the standards of Title I of the Americans with Disabilities Act (ADA) of 1990. 29 U.S.C. § 794(d). In order to prove a violation of the ADA, the alleged discrimination "must occur in regard to some adverse personnel decision or other term or condition of employment." *Marshall v. Federal Express Corp.,* 130 F.3d 1095, 1099 (D.C.Cir.1997).

Plaintiff has presented sufficient evidence to survive summary judgment on the question of whether his disability qualifies under the statute and regulations and whether he was otherwise qualified to perform his job. Parties dispute when DEA became aware of plaintiff's disability. Plaintiff alleges that from the start of his employment with DEA, he provided information about and received certain accommodations for his disability. Defendant, in response, makes the rather astounding claim that it was not aware of plaintiff's disability, despite the fact that it hired plaintiff under a special program for disabled persons. *See* Def.'s Br. at 2, 34.

Finally, the Court must acknowledge that the accommodations requested by plaintiff—a chair, a handicapped parking space, and a later lunch hour—were not especially burdensome. The government admits that it failed to provide any of these accommodations for quite a long period of time, but blames the delay on plaintiff for failing to provide adequate medical documentation. *Id;* Def.'s Reply Br. at 3. Defendant alleges that because it eventually provided plaintiff with the requested chair

and parking space, plaintiff's Rehabilitation Act should be denied. Two things are clear to the Court, however: first, plaintiff never received his requested authorization to take a late lunch. Defendant claims to have determined that this accommodation was made irrelevant by the fact that the gym formerly used by plaintiff to exercise was closed. Def's Br. at 7 n. 10. Second, there was a considerable delay of over a year before plaintiff allegedly received his chair and parking space. Def.'s Br. at 34; Def.'s Reply Br. at 3. The reasons for that delay are in dispute and are a question properly left for the trier of fact. Furthermore, whether plaintiff was reasonably accommodated at all is also a matter for a trier of fact to determine. Thus, defendant is not entitled to summary judgment on plaintiff's Rehabilitation Act claim because there are several material issues in dispute.

## V. Hostile Work Environment

Plaintiff has alleged that the series of events starting in 1995 and continuing through the end of his employment with DEA in 1999 constituted sufficiently severe conditions as to constitute a hostile work environment in violation of Title VII. Defendant in response claims that plaintiff was "hypersensitive" and "ascribe[d] an improper motive to each actor for each action that displeased him." Def.'s Br. at 38. Defendant claims that plaintiff's allegations do not rise to level of objectively severe and pervasive harassment necessary to prove a violation of Title VII. In short, the Court holds that the existence and pervasiveness of any alleged harassment is a question for the jury to decide.

In order to prevail on a hostile work environment claim under Title VII, a plaintiff must prove that "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' ... that is

**24**

'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). The *Harris* Court explained that whether an environment is hostile is determined by looking at the totality of the circumstances: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to whether the plaintiff actually found the environment abusive." *Harris,* 510 U.S. at 23, 114 S.Ct. 367.

Very rarely will such fact-based determinations be appropriate for determination on summary judgment. The defendant's argument against the severity of the workplace harassment here depends on many factual assumptions disputed by the plaintiff. This Court is persuaded that the determination of whether the plaintiff was actually harassed and whether that harassment was sufficiently severe and pervasive is a question for the jury.

## VI. Constructive Discharge

■ In plaintiff's opposition to defendant's motion for summary judgment, he for the first time argued that the defendant's actions constituted a constructive discharge, forcing him to leave the DEA and seek employment elsewhere. Defendant correctly points out in its reply brief that plaintiff did not allege a constructive discharge claim in his complaint. He did complain that defendant's actions with respect to placing him on unpaid leave were discriminatory and retaliatory, but never alleged that he was forced to terminate his employment with DEA.

Allowing plaintiff to raise this claim now, after lengthy discovery has been completed, would unfairly prejudice the defendant's ability to defend such a claim. Because there is no apparent or declared reason for amending the plaintiff's complaint now to include a constructive discharge claim, this Court will not allow the plaintiff to proceed on that issue. Summary judgment is granted for the defendant on this claim.

### CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that defendant's motion for summary judgment is **GRANTED** with respect to plaintiff's constructive discharge claim; it is

**FURTHER ORDERED** that with respect to all other claims, defendant's motion for summary judgment is **DENIED.**

**IT IS SO ORDERED.**