Elayne R. MITCHELL, Plaintiff,

v.

NATIONAL RAILROAD PASSENGER CORPORATION, et al., Defendants.

No. CIV.A. 01–1866(RWR).

United States District Court, District of Columbia.

Dec. 30, 2005.

Martha Walfoort, James & Hoffman, P.C., Washington, DC, for Plaintiff.

Gerald T. Ford, Joseph M. Tomaino, Landman Corsi Ballaine & Ford, P.C./NJ, Newark, NJ, Mark S. Landman, Landman Corsi Ballaine & Ford P.C., New York, NY, for Defendants.

### MEMORANDUM OPINION
### AND ORDER

ROBERTS, District Judge.

██ Plaintiff Elayne Mitchell, formerly employed by defendant National Railroad Passenger Corporation ("Amtrak") in its human resources department, filed an amended complaint against Amtrak for race discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, et seq. (2000), and 42 U.S.C. § 1981 (" § 1981")(Count I); age discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621, et seq. (Count II); gender discrimination in violation of Title VII (Count III); perceived disability discrimination in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101, et seq. (Count IV); and race, age, gender and perceived disability discrimination in violation of the D.C. Human Rights Act ("DCHRA"), D.C.Code Ann. §§ 2–1401.01, et seq. (2001)(Count V). Plaintiff also set forth claims against Amtrak management and supervisory employees Lorraine Green and Paula Porter for race discrimination under § 1981 (Count I) and for sex, race, age and perceived disability discrimination under the DCHRA (Count V).[1]

Defendants moved for summary judgment on all claims against them. Because plaintiff raises a genuine issue of material fact regarding whether Amtrak's decision to terminate her and not to hire her for a northeast corridor manager position was motivated by her race or gender, Amtrak's motion will be denied as to Counts I and III. Accordingly, because defendants Green and Porter participated in Amtrak's decision to terminate her employment, their motion will be denied as to the termination claim under § 1981 in Count I. Because defendants Green and Porter played no role in Amtrak's decision not to hire her for the manager position, their motion will be granted as to the failure to hire claim under § 1981 in Count I. Because plaintiff has not demonstrated that age played any role in Amtrak's decision to terminate her employment and to not hire her for the manager position, or that Amtrak's proffered legitimate and nondiscriminatory basis for its actions was a pretext for age discrimination, Amtrak's motion will be granted as to Count II. Because there are no material facts in dispute with regard to certain elements of plaintiff's perceived disability claim, and Amtrak is entitled to judgment as a matter of law on that claim, Amtrak's motion will be granted as to Count IV.

Because plaintiff's race, age, gender and perceived disability claims under the DCHRA are subject to virtually the same legal analysis that governs Counts I through IV under federal law, judgment will be granted to defendants on Count V

---

1. To the extent plaintiff also set forth claims against Green and Porter under Title VII, Title VII does not provide for liability against individual employees. *See Gary v. Long*, 59 F.3d 1391, 1399 (D.C.Cir.1995) (holding that an employer alone is liable for a violation of Title VII by supervisory employees); *Martin v.*

*Howard Univ.*, No. 99–1175, 1999 WL 1295339 (D.D.C. Dec.16, 1999) (dismissing individually named defendants because employer was solely liable for violations of Title VII). Green and Porter's motion to dismiss Title VII claims against them will be granted.

with respect to plaintiff's claims of age and perceived disability discrimination, but Amtrak's motion will be denied on plaintiff's race and gender discrimination claims in Count V. Green and Porter's motion regarding plaintiff's race and gender discrimination in termination claims in Count V will be denied as the DCHRA, unlike Title VII, does subject Green and Porter to individual liability. However, because Green and Porter did not participate in the hiring decision for the manager position, judgment will be granted to them as to the failure to hire claims in Count V.

## BACKGROUND

### I. PLAINTIFF'S EMPLOYMENT WITH AMTRAK

Plaintiff, an African–American female, worked in Amtrak's corporate Human Resources ("HR") Department in Washington, D.C. from January 1996 to January 2000. (*See* Defs.' Stmt. Fact ¶¶ 1, 2, 22; Pl.'s Stmt. Fact ¶ 100.) Amtrak hired plaintiff as a Human Resources Project Leader, and later changed her title to Human Resources Consultant. (*See* Pl.'s Am. Compl. ¶ 9; Defs.' Ans. ¶ 9.) Plaintiff worked in the HR Department's Workforce Development unit at the time Amtrak terminated her employment. (*See* Defs.' Stmt. Fact ¶¶ 12, 13.)

Defendant Paula Porter, an African–American female and the former Director of the Workforce Development unit in the HR Department,[2] interviewed plaintiff and recommended and sought approval for her hiring in 1996. (*See* Decl. of Gerald T. Ford ("Ford Decl."), Ex. 7 at 24–26.) Porter supervised plaintiff throughout her employment with Amtrak. (*See id.,* Ex. 5 at 37.) Defendant Lorraine Green is an African–American female and Vice–President of Amtrak's HR Department. (*See* Defs.' Stmt. Fact ¶¶ 20–21.) Porter was 48 years old, and Green was 54 years old, at the time Amtrak terminated plaintiff's employment. (*See* Pl.'s Stmt. Fact ¶ 15; Defs.' Stmt. Fact ¶ 21.)

When Amtrak hired plaintiff in 1996, she represented to Amtrak on her employee information form that her date of birth was November 27, 1940. (*See* Pl.'s Stmt. Fact ¶ 2; Ford Decl., Ex. 2 at A00118.) Plaintiff's actual date of birth was November 27, 1932. (*See* Pl.'s Stmt. Fact ¶ 2; Decl. of Martha Walfoort ("Walfoort Decl."), Ex. 1.)

During her employment, plaintiff "was responsible for analyzing the educational and training needs of Amtrak's employees, designing and implementing programs, and assessing training programs for Amtrak's employees." (Pl.'s Am. Compl. ¶ 9; *see* Defs.' Ans. ¶ 9.) Plaintiff provided these services to employees in Amtrak's three strategic business units ("SBUs")— Northeast Corridor ("NEC"), Inter–City and West—and "provided training services to all Amtrak management employees . . . , which included employees in the [SBUs] as well as corporate headquarters." (Defs.' Stmt. Fact ¶ 25; Pl.'s Stmt. Fact ¶ 25.) When Amtrak management and supervisory employees required leadership and supervisory development training, plaintiff was responsible for delivering the training. (*See* Defs.' Stmt. Fact ¶ 26; Pl.'s Stmt. Fact ¶ 26; Ford Decl., Ex. 7 at 92–93, Ex. 5 at 36–37 (plaintiff's deposition testimony that "[she] provided the training throughout Amtrak for all of the training that fell under the title of leadership development," and that she had such a duty throughout her tenure), Ex. 23 at 405 (plaintiff's EEOC affidavit in which she states, "[i]n 1999, . . . I led a company-wide assessment

---

**2.** Some time after plaintiff's termination, Porter assumed the position of Assistant Vice-President of the HR Department. (*See* Defs.' Stmt. Fact ¶ 16.)

of the skills gaps among front-line supervisory personnel, and developed and managed the majority of the training courses the HR Department used that year, including ... all leadership/supervisory courses").)

## II. PAUL BELLO'S HIRING

In June 1998, Amtrak posted a job opening for an HR Consultant (Management/Executive Education) position. (*See* Defs.' Reply at 11; Pl.'s Stmt. Fact ¶ 115; Ford Decl., Ex. 32.) Porter testified in her deposition that as Amtrak got closer to hiring someone for the position, Amtrak's "needs changed and parts of [the June 1998 job posting] were no longer applicable." (Walfoort Decl., Ex. 6 at 186.) Amtrak asserts that plaintiff never applied for the HR Consultant position posted in June 1998. (*See* Defs.' Reply at 12.)

In May 1999, Porter selected Paul Bello, a 49–year–old white male, to fill the vacant HR Consultant position and sought approval from Lorraine Green. (*See* Ford Decl., Ex. 33 and Ex. 35; Walfoort Decl., Ex. 4 at 5.) In seeking approval for Bello's hiring, Porter noted that "[t]he position for which [Bello] has been selected not only requires knowledge of training, but it is also critical that the successful candidate possess an understanding of explicit performance improvement systems." (Ford Decl., Ex. 33.) Among other skills, Porter specifically noted that Bello's hiring would bring to the Workforce Development unit "[e]xperience in the design and development of automated systems to measure and track key performance indicators" (*id.*), as well as "[i]ndepth knowledge of transactional delivery systems ...." (*Id.*) Amtrak hired Bello as an HR Consultant in the Workforce Development unit on May 31, 1999. (*See id.*, Ex. 34.)

## III. RESTRUCTURING THE WORKFORCE DEVELOPMENT UNIT

In 1998, Amtrak hired PricewaterhouseCoopers ("PWC") to assess its HR Department. (*See* Walfoort Decl., Ex. 26.) According to Amtrak, "[t]he objective of the assessment was to improve client services and establish a more efficient Human Resources Department." (*Id.*, Ex. 25 at 4.)

In November 1999, Porter prepared a power point presentation entitled "Workforce Development: Framework for the Future State—Amtrak Human Resources—November, 1999." (Ford Decl., Ex. 7 at 115, Ex. 10.) In the power point presentation, Porter set forth multiple challenges facing the Workforce Development unit (*see id.*, Ex. 10 at 1), as well as an analysis of the Workforce Development unit. (*See id.*, Ex. 10 at 2.) Plaintiff testified during her April 2002 deposition that the challenges identified by Porter in November 1999 had "been around ... for a while" (Walfoort Decl., Ex. 7 at 74), and that Porter's analyses were accurate for both the Workforce Development unit and the HR Department as a whole. (*See id.* at 76–77.)

Porter indicated in her power point presentation that the Workforce Development unit in November 1999 was "segmented/disjointed, inefficient, costly" (Ford Decl., Ex. 10 at 2), and that "accountabilities [were] unclear leading to slow responsiveness, divergent priorities, and impeded service delivery[.]" (*Id.*) Porter's assessment was consistent with plaintiff's deposition testimony that the Workforce Development unit was "extremely competent in developing plans[,]" but was "not equally as competent in implementation of those plans, and subsequently the personnel in the [SBUs] were dissatisfied with our delivery." (*Id.*, Ex. 5 at 78.) Plaintiff testified that the SBUs' dissatisfaction arose from the Workforce

Development unit's failure to deliver on promises because some of the Workforce Development unit team members were not "matched skill[-]wise and competency[-]wise with some of the roles identified that some of the team members had to accomplish or were asked to accomplish." (*Id.* at 79.)

Porter recommended in the power point presentation restructuring the Workforce Development unit by "eliminat[ing] one position—HR Consultant, Leadership/Supervisory training." (*Id.*, Ex. 10 at 8.) Porter's presentation concluded, in part, that the "[o]utsourcing of Leadership/Supervisory programs [would] maximize/leverage internal resources, while expanding developmental networks." (*Id.*) The proposed Workforce Development unit organizational restructuring[3] eliminated the HR Consultant position held by plaintiff. (*Compare id.* at 4, *with id.* at 7.) According to Amtrak, its decision to outsource plaintiff's position resulted from the PWC review. (*See* Walfoort Decl., Ex. 25 at 4.)

Porter testified in her April 2002 deposition that she made a decision around November 1999 "that in order to become more efficient and effective, [the Workforce Development unit was] going to outsource leadership development training. [The Workforce Development unit was] going to focus greater attention on analysis and tracking of training and forecasting for that training and providing greater support nationally." (Ford Decl., Ex. 7 at 113.) Porter testified that the decision to outsource leadership development training was based on a need to (1) "create a universal competency base" for Amtrak managerial employees; (2) "cover a diverse geographic area"; and (3) "become more responsive in the way that training was delivered." (*Id.* at 131.)

Porter testified that as a result of her decision to outsource leadership development training and eliminate plaintiff's position in the Workforce Development unit, she selected the American Management Association ("AMA") to provide leadership and supervisory training. (*See id.* at 133–34; *see also id.*, Ex. 10 at 7 (Porter's power point presentation denoting that external contractors would be responsible for development and delivery of leadership and supervisory training programs).) Porter was familiar with the AMA and its training capabilities, having participated in AMA training programs "[t]hroughout [her] career, both at Amtrak and the bank." (*Id.*, Ex. 7 at 134–35.)

Gerri Hall, an African–American female and Amtrak's Assistant Vice–President of Human Resources in January 2000,[4] approved Porter's recommendation to restructure the Workforce Development unit and eliminate plaintiff's HR Consultant position. (*See* Defs.' Stmt. Fact ¶ 42; Ford Decl., Ex. 7 at 115–116, Ex. 8 at 106–07.) Hall was 40 years old at the time Amtrak terminated plaintiff's employment. (*See* Defs.' Stmt. Fact ¶ 18.) After Hall approved Porter's recommendation, Green gave final approval to the proposal. (*See id.* ¶ 43.)

Amtrak advised plaintiff by letter dated January 7, 2000 that the company was eliminating her position as an HR Consultant in the Workforce Development unit

---

**3.** Porter's power point presentation also proposed changing Bello's job title from HR Consultant to Senior Manager (*see* Ford Decl., Ex. 10 at 4, 7), which was accomplished through a reclassification in April 2000 "pursuant to [the] 1999 restructuring[.]" (Walfoort Decl., Ex. 30.) Bello's salary did not change as a result of the reclassification. (*See* Ford Decl., Ex. 34; Walfoort Decl., Ex. 30.)

**4.** In February 2001, Hall assumed the position of Vice–President of Business Diversity. (*See* Ford Decl., Ex. 8 at 21.)

effective January 21, 2000. (*See* Ford Decl., Ex. 11 at 1.) The letter advised plaintiff that she would receive, among other benefits, two weeks notice pay and four weeks severance pay if she did not sign a release agreement, or six weeks severance pay if she did sign a release agreement.[5] (*See id.* at 1, 2.) The termination letter informed plaintiff that she had 45 days to consider whether to sign a release agreement (*see id.* at 2), and further provided that plaintiff could "apply for other Amtrak positions during [her] two-week notice period." (*Id.* at 3.) Plaintiff did not sign the release agreement offered by Amtrak. (*See id.*, Ex. 5 at 134.) She also did not apply for any Amtrak positions during her two-week notice period or at any time after Amtrak terminated her employment. (*See id.* at 130, 134.)

## IV. PLAINTIFF'S APPLICATION FOR THE NEC MANAGER POSITION

In October 1999, before Amtrak eliminated plaintiff's HR Consultant position in January 2000, she applied for a position with Amtrak as the Employee Services–NEC Manager, one of three SBU Manager vacancies. (*See id.* at 102; Ford Decl., Ex. 50, Ex. 13 at 15.) Rose Bacchus, an African–American female who was 53 years old in January 2000, was the Director of Employee Services[6] for Amtrak and the decisionmaker with respect to the NEC Manager position for which plaintiff applied. (*See* Defs.' Stmt. Fact ¶¶ 52, 53, 59; Ford Decl., Ex. 13 at 15, 17.) Bacchus testified in a deposition that the Employee Services unit acted as an "ombudsman" for employees (*see* Defs.' Stmt. Fact ¶ 55), serving as a "resource" for any questions

or problems that any employee had and working to "pull the right people together" to get any questions or problems resolved quickly. (*Id.* ¶¶ 55, 56.) The Employee Services unit consisted of only Bacchus and the four managers she supervised— one for each of the SBUs (NEC, Inter–City and West) and one to handle whistleblower and ADA issues. (*See id.* ¶¶ 57, 58.) Bacchus interviewed candidates for the three SBU manager positions in December 1999, and January and February 2000. (*See* Ford Decl., Ex. 15, Ex. 18 and Ex. 19.)

The October 1999 NEC Manager job posting provided that the NEC Manager "[a]dministers and coordinates company sponsored employee services to further the development of employee-company relationships" (Ford Decl., Ex. 14), and indicated that the NEC Manager "[o]ften conducts difficult employee counseling sessions regarding hiring practices, salary, job classification, promotion, discipline, performance and termination." (*Id.*) The job posting further indicated that it was "preferred" that a candidate have a bachelor's degree or senior human resource management certification (*see id.*), and provided that a candidate "[m]ust effectively create and use written materials, oral presentations and [verbal] interchange, and be at ease working with [senior] staff members." (*Id.*)

Michael Ramirez, a Senior Director of Workforce Management at the time, was 43 years old when Amtrak posted the NEC Manager position in October 1999. (*See* Defs.' Stmt. Fact ¶¶ 66, 67; Pl.'s Stmt. Fact ¶ 66.) Ramirez provided assistance to Bacchus in the interview and se-

---

**5.** By letter dated January 12, 2000, Amtrak revised its severance pay offer to plaintiff to reflect her eligibility for eight weeks severance pay with a signed release agreement. (*See* Walfoort Decl., Ex. 8.)

**6.** Bacchus retired from Amtrak in October 2001. (*See* Ford Decl., Ex. 13 at 5.)

lection process (*see* Pl.'s Stmt. Fact ¶ 68), but "it really was [Bacchus's] decision" on whom to hire for the NEC Manager position (Ford Decl., Ex. 13 at 66), subject to approval from her supervisor Gerri Hall. (*See* Walfoort Decl., Ex. 16 at 71–72.[7])

Bacchus created interview forms and wrote the interview questions for the NEC Manager position. (*See* Ford Decl., Ex. 13 at 28.) Bacchus and Ramirez used the same form and asked the same questions of each candidate during the interview process. (*See id.* at 41.) Bacchus testified in her August 2002 deposition that although she tried to use the candidate rating system—strong, good and weak—that she included on the interview form (*see id.* at 41, 64–65), she "may not have checked it every time . . . ." (*Id.* at 41.)

According to Bacchus, in comparison to a candidate's written application or resume, the interview process was the "key component" to the selection process for the SBU manager positions. (*See id.* at 62.) Bacchus testified that "the interview would certainly override, would be more important to [her] than the application because [she] get[s] more information from the interview." (*Id.*) She explained that at the interview stage, she was interested in having a candidate elaborate on the words contained on her or his application or resume. (*See id.* at 63.)

Bacchus testified that it was important for the Employee Services SBU managers to have (1) interpersonal communication skills; (2) knowledge of Amtrak; (3) relationships, such as professional networks, within Amtrak; and (4) an ability to appropriately bring all of these together. (*See id.* at 29.) She defined interpersonal communication skills to include "listening as well as the ability to communicate with all levels of people in a variety of situations" (*id.* at 30), and knowledge of Amtrak such as knowing the organization's lines of division, as well as the spheres of responsibility for different employees in particular areas within Amtrak. (*See id.*) Bacchus testified that relationships within Amtrak means establishing professional networks within various parts of the organization. (*See id.* at 30–31.)

According to Bacchus, the ability of the Employee Services SBU managers to bring all of these attributes together was necessary because

> a large part of the job with so many people and one person doing it is being able to reach out and bring the appropriate people together to expedite things getting done. And part of the job is to remove the logjams that are there. So necessarily in order to avoid them you have to know what they are, and that's what I mean by the network pieces. Who can I call with this problem? Who can get it done right now?

(*Id.* at 31.) Bacchus believed that the Employee Services SBU manager's networking capability was "absolutely critical" to the job, and that the SBU managers would need to use discretion, good judgment and maturity in dealing with individual personalities. (*See id.* at 33.)

Ramirez testified in his April 2002 deposition that, with respect to the NEC, Intercity and West manager positions, he and Bacchus discussed having a diverse group of managers:

> In this particular position—and I'm saying all three positions—we were hoping to have a diverse group. . . . [W]e were hoping that . . . we would have a nice mix. You know, it would help the diver-

---

7. Bacchus testified in her August 2002 deposition that seeking Hall's approval was a "formality" and that the verbal notification to Hall was to merely inform her that she was about to fill the NEC Manager position. (*See* Walfoort Decl., Ex. 16 at 71–73.)

sity issue, a mix of—you know, taking into account gender and race and national origin. And that's a general subject that is discussed with hiring managers all the time.

(Walfoort Decl., Ex. 13 at 124–25.) Bacchus testified during her deposition that diversity was not an issue and that the topic never came up in discussions with Ramirez. (*See id.*, Ex. 16 at 60.)

In January 2000, Bacchus selected Carolyn Janet Harvey for the Employee Services Intercity Manager position. (*See* Defs.' Stmt. Fact ¶ 72; Ford Decl., Ex. 18.) Harvey is an African–American female and was 51 years old when Bacchus selected her for the position. (*See* Defs.' Stmt. Fact ¶ 72.) Bacchus selected Harvey because she "had been around ... about 28 years or so. She knew literally ... every organizational reference change. She knew the people. She knew the politics. She knew the culture." (Ford Decl., Ex. 13 at 58; *see* Defs.' Stmt. Fact ¶¶ 73, 74.) Bacchus also hired the Employee Services West Manager in January 2000, selecting Robin Brown for the position. (*See* Defs.' Stmt. Fact at ¶ 75; Ford Decl., Ex. 19.) Brown, an African–American female who was 36 years old at the time Bacchus selected her, had been employed by Amtrak for about 18 years. (*See* Defs.' Stmt. Fact at ¶ 75; Ford Decl., Ex. 13 at 58–59.) Bacchus characterized Brown's knowledge of Amtrak as similar to that of Harvey, and stated that Brown "knew [the Western Region] inside out" and was "well respected[.]" (Ford Decl., Ex. 13 at 59.) Amtrak confirmed Harvey's and Brown's selections by letters dated January 7, 2000, and indicated that their promotion date would be January 16, 2000. (*See id.*, Ex. 18 and Ex. 19.)

Amtrak posted the NEC Manager job listing on two occasions, from October 7 to October 14, 1999, and from January 26 to February 2, 2000. (*See id.*, Ex. 15.) Plaintiff, along with four other candidates, interviewed for the NEC Manager position in December 1999. (*See* Defs.' Stmt. Fact ¶ 78.) She met with Bacchus and Michael Ramirez on December 16, 1999. (*See* Defs.' Stmt. Fact ¶ 62; Ford Decl., Ex. 15.) According to Bacchus, plaintiff was her lowest ranking candidate for the NEC Manager position. (*See* Ford Decl., Ex. 13 at 45.) Bacchus believed that plaintiff's tenure of only "a couple of years" with Amtrak "showed ... [in] her awareness about the organization itself ...." (*Id.*) Bacchus testified that she was concerned about having to "probe more" to try to get complete answers from plaintiff to the interview questions. (*See id.*) Plaintiff's answers "just made [Bacchus] far less comfortable than was necessary" (*id.* at 46), and Bacchus felt that they were not in-depth or thoughtful. (*See* Defs.' Stmt. Fact ¶ 98; Ford Decl., Ex. 13 at 46–47.)

Ramirez also ranked plaintiff low in comparison to the other candidates interviewed in December 1999, placing her near the bottom of his list.[8] (*See* Ford Decl., Ex. 17 at 118; Defs.' Stmt. Fact ¶ 92; Pl.'s Stmt. Fact ¶ 92.) Ramirez testified that "[t]he skill sets that [plaintiff] possesse[d] weren't necessarily the skill sets that [they] were looking for specifically for the manager of employee services." (Ford Decl., Ex. 17 at 117.) According to Ramirez, he and Bacchus agreed that although plaintiff met the minimum qualifications for the position, she was not "considered the most highly qualified candidate." (*Id.*) Ramirez testified that he and Bacchus discussed plain-

---

8. Ramirez testified that assuming there were five candidates at the time he ranked the candidates, he "probably" would have ranked plaintiff fourth. (*See* Ford Decl., Ex. 17 at 118.)

tiff's "difficulty in responding to the questions in concise, clear answers" and that they "had to continuously rephrase questions or keep probing in order to elicit responses" from plaintiff. (*See id.*)

Plaintiff was notified on January 21, 2000, that she had not been selected for the NEC Manager position.[9] (*See id.*, Ex. 16.) On January 24, 2000, Robert Dougherty, a white male Amtrak employee, interviewed for the NEC Manager position. (*See* Pl.'s Stmt. Fact ¶ 198; Ford Decl., Ex. 15.) Two days later, Amtrak re-posted the availability of the NEC Manager position (*see* Ford Decl., Ex. 15), and Dougherty formally submitted an application for the position around February 1, 2000. (*See* Walfoort Decl., Ex. 33.)

Amtrak employee Barry Warner also submitted an application for the NEC Manager position after the second job posting (*see* Ford Decl., Ex. 21), and completed his interview on February 11, 2000. (*See id.*, Ex. 15.) Warner is a white male, was 52 years old in February 2000 and had been employed by Amtrak since 1976. (*See* Defs.' Stmt. Fact ¶¶ 79, 80; Ford Decl., Ex. 15, Ex. 13 at 61, Ex. 20 at 1 and Ex. 21.)

Plaintiff asserts that Dougherty was offered the NEC Manager position and turned the offer down. (*See* Pl.'s Stmt. Fact ¶ 198.) On February 18, 2000, Ramirez sent Dougherty a letter confirming his rejection of an offer for the NEC Manager position.[10] (*See* Walfoort Decl., Ex. 34 ("We regret that you were unable to accept our offer for the position of Manager, Employee Services, Amtrak Northeast Corridor.").) That same day, Ramirez

sent Warner a letter congratulating him on having been offered the NEC Manager position, confirming Warner's acceptance of the job offer, and notifying him that his promotion date would be March 1, 2000. (*See id.*, Ex. 15.) According to Bacchus, she selected Warner because "[h]e had a knowledge of the entire organization ... not limited to the corridor." (Ford Decl., Ex. 13 at 44.) Bacchus also believed Warner had "an extraordinary background in interviewing and investigations" and "a great desire to do the [NEC Manager] job." (*Id.*)

## V. PLAINTIFF'S DEGENERATIVE ARTHRITIS CONDITION

Plaintiff claims to suffer from degenerative arthritis. (*See* Defs.' Stmt. Fact ¶ 10; Pl.'s Stmt. Fact ¶ 10.) Plaintiff admits that the condition did not interfere with her duties as an HR Consultant, but asserts that it caused her to use a cushioned chair at work and to have a slight limp on occasion. (*See* Defs.' Stmt. Fact ¶ 11; Pl.'s Stmt. Fact ¶ 11.) "At various times, [Porter and plaintiff] talked about [their] back problems" (Walfoort Decl., Ex. 6 at 233), and Porter "was aware that [plaintiff] periodically had pains" and knew that Amtrak provided her with an oversized chair. (*Id.* at 233–234.) Plaintiff asserts that she informed Porter in December 1999 that she needed surgery due to her degenerative arthritis condition. (*See* Pl.'s Am. Compl. ¶ 15; Pl.'s Opp'n at 42, 43.)

## DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to inter-

---

9. Bacchus testified that she did not discuss and assess with Ramirez the candidates for the NEC Manager position, and a selection for the position was not made, until after all of the candidates had been interviewed. (*See* Ford Decl., Ex. 13 at 65–66.)

10. Bacchus testified that she was unaware that an offer had been extended to Dougherty. (*See* Walfoort Decl., Ex. 16 at 75–76.)

rogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *see Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1288 (D.C.Cir. 1998). The record must be viewed in the light most favorable to the nonmoving party. *See Aka*, 156 F.3d at 1288.

The moving party carries the initial burden to either identify evidence that demonstrates the absence of a genuine issue of material fact, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), or "point[ ] to the absence of evidence proffered by the nonmoving party." *Baker v. Potter*, 294 F.Supp.2d 33, 38 (D.D.C.2003). Summary judgment is inappropriate if a reasonable factfinder could find in the non-moving party's favor. "The non-moving party's opposition, however, 'must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial.'" *McCain v. CCA of Tenn., Inc.*, 254 F.Supp.2d 115, 119 (D.D.C.2003) (citation omitted); *see Harding v. Gray*, 9 F.3d 150, 154 (D.C.Cir. 1993) ("[M]ere unsubstantiated allegation ... creates no 'genuine issue of fact' and will not withstand summary judgment."); *Sage v. Broadcasting Publ'ns, Inc.*, 997 F.Supp. 49, 53 (D.D.C.1998) ("Conclusory allegations made in affidavits opposing a motion for summary judgment are insufficient to create a genuine issue of material fact."); *Baker*, 294 F.Supp.2d at 38 (non-moving party may not rely solely on allegations or conclusory statements). "If the evidence 'is merely colorable, or is not significantly probative, summary judgment may be granted.'" *Baker*, 294 F.Supp.2d at 38 (quoting *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

Discrimination claims brought under Title VII, § 1981, the ADEA, the ADA and the DCHRA are governed by the burden-shifting framework articulated by the Supreme Court for Title VII cases in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Carney v. Am. Univ.*, 151 F.3d 1090, 1092–93 (D.C.Cir.1998) (§ 1981); *Hall v. Giant Food, Inc.*, 175 F.3d 1074, 1077 (D.C.Cir.1999) (ADEA); *Marshall v. Fed. Express Corp.*, 130 F.3d 1095, 1099 (D.C.Cir.1997) (ADA); *Futrell v. Dep't of Labor Fed. Credit Union*, 816 A.2d 793, 802 (D.C.2003) (DCHRA). Under that framework, the plaintiff has the initial burden of demonstrating by a preponderance of the evidence a *prima facie* case of discrimination. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If a plaintiff succeeds in establishing her *prima facie* case, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employment action being challenged. *See id.* at 253, 101 S.Ct. 1089. The employer "need not persuade the court that it was actually motivated by the proffered reasons." *Id.* at 254, 101 S.Ct. 1089. Rather, "[t]he defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (internal quotations omitted).

If the defendant proffers a legitimate and nondiscriminatory reason for its employment decision, the plaintiff must have an opportunity to prove by a preponderance of the evidence that the offered

reason was not its true reason, but was a pretext for intentional discrimination. *See Burdine,* 450 U.S. at 253, 101 S.Ct. 1089. A plaintiff may meet her burden of proving intentional discrimination by " 'either directly persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.' " *Dunaway v. Int'l Bhd. of Teamsters,* 310 F.3d 758, 763 (D.C.Cir. 2002) (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 716, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983)). Ultimately, the question is whether the jury could infer discrimination based on a combination of (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to challenge the employer's proffered reasons for its decision; and (3) any additional evidence of discrimination that may be available to the plaintiff (*e.g.,* independent evidence of discriminatory attitudes or statements attributable to the employer). *See id.* (citations omitted); *Aka,* 156 F.3d at 1289. The ultimate burden of persuasion that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. *See Burdine,* 450 U.S. at 253, 101 S.Ct. 1089.

# I. JANUARY 2000 TERMINATION

## A. *Race and gender discrimination under Title VII and § 1981*

 Defendants virtually concede in their motion for summary judgment that plaintiff has made out a *prima facie* case of race and sex discrimination under Title VII and § 1981 with respect to her discriminatory termination claim.[11] (*See* Defs.' Mem. Supp. Summ. J. at 12 ("For purposes of this motion only, defendant will assume that plaintiff has satisfied the minimal standards for a *prima facie* case with respect to her race, sex and age discrimination termination claims.").)

**11.** The individual defendants contend, however, that they are not subject to suit as individuals under § 1981. (Def.'s Mot. to Dismiss at 10.) Unlike under Title VII, individual defendants can be sued for intentional race discrimination under § 1981 if they are personally involved in the discrimination or if plaintiff can "demonstrate some affirmative link to causally connect" the individual defendant with the discriminatory act. *Patterson v. County of Oneida,* 375 F.3d 206, 229 (2d Cir.2004); *see also Flores v. Denver,* 30 Fed.Appx. 816, 819 (10th Cir. 2002) (holding that the individual defendant does not have to be in privity of contract with the plaintiff to be held liable under § 1981); *Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 75 (2d Cir.2000); *Al–Khazraji v. Saint Francis Coll.,* 784 F.2d 505, 518 (3d Cir.1986); *Jones v. Continental Corp.,* 789 F.2d 1225, 1231 (6th Cir.1986); *Tillman v. Wheaton–Haven Recreation Ass'n, Inc.,* 517 F.2d 1141, 1146 (4th Cir.1975). *But see Foley v. Univ. of Houston Sys.,* 355 F.3d 333, 338 (5th Cir.2003) (noting "a tension between [two] decisions ... with respect to the liability of individual defendants who are not party to the employment contract" under § 1981). The persuasive authority in this district also supports this view. *See e.g., MacIntosh v. Bldg. Owners & Managers Ass'n Int'l,* 355 F.Supp.2d 223, 227 (D.D.C.2005)(noting that the reach of § 1981 is much broader than that of Title VII); *Richard v. Bell Atl. Corp.,* 946 F.Supp. 54, 74 (D.D.C.1996) (holding that "[o]fficers, directors and employees of a corporation may become personally liable" under § 1981) (internal quotations omitted); *Sheppard v. Dickstein, Shapiro, Morin & Oshinsky,* 59 F.Supp.2d 27, 33 (D.D.C.1999); *Weaver v. Gross,* 605 F.Supp. 210, 212–213 (D.D.C.1985) (holding that individuals can be held liable under § 1981 only when they have been personally involved or directly participated in the discrimination). *Contra Hunter v. Ark Rests. Corp.,* 3 F.Supp.2d 9, 15–16, 17 (D.D.C.1998) (stating that individuals cannot be held liable under § 1981 and DCHRA, but citing only Title VII cases to support that finding). Section 1981, however, reaches only racial discrimination, and thus Green and Porter are subject to liability for only racial discrimination, and not gender discrimination, under Count I.

However, defendants proffer that they terminated plaintiff's employment based on a business decision in November 1999 resulting from the PWC review to restructure the Workforce Development unit, resulting in Amtrak's outsourcing to the American Management Association the leadership and supervisory training functions formerly resident in the Workforce Development unit. According to defendants, Porter sought to have the Workforce Development unit provide greater support to Amtrak nationally by becoming more efficient and effective by focusing greater attention on training analysis and forecasting. (*See* Ford Decl., Ex. 7 at 113.) Porter's November 1999 power point presentation, which set forth her vision of a restructured Workforce Development unit, proposed eliminating the Workforce Development unit's leadership and supervisory training to "maximize [and] leverage internal resources, while expanding developmental networks," and identified the HR Consultant, Leadership/Supervisory training position for elimination. (*See id.,* Ex. 10 at 8.) Plaintiff developed and managed the majority of the training courses the HR Department used in 1999, including "all leadership/supervisory courses." (*Id.,* Ex. 23 at 405, Ex. 5 at 36–37.)

Defendants have set forth a legitimate and nondiscriminatory basis for terminating plaintiff's employment, namely, plaintiff's position was no longer needed due to Amtrak's decision to outsource its leadership and supervisory training. If accepted as true by the trier of fact, the proffered justification would sustain a finding that unlawful discriminatory animus did not motivate Amtrak's decision to terminate plaintiff's employment. *See Hicks,* 509 U.S. at 507, 113 S.Ct. 2742. The question thus becomes whether, based on the evidence in the record, a reasonable jury could find that defendants intentionally discriminated against plaintiff. *See Dunaway,* 310 F.3d at 763. Plaintiff seeks to carry her burden of showing intentional discrimination by making several assertions to demonstrate that (1) the defendants' proffered legitimate and nondiscriminatory basis for her termination was pretextual and is in material factual dispute, and (2) additional evidence of defendants' discrimination could persuade a jury of intentional discrimination against her.

### 1. The PricewaterhouseCoopers "recommendation"

Plaintiff argues that it is "demonstrably false" that PWC "recommended the outsourcing of leadership training" (Pl.'s Opp'n at 7) in its December 1998 Assessment of Amtrak's Human Resources Function report. (*See* Walfoort Decl., Ex. 26.) She further argues that the falsity is "compounded" by Porter's testimony that restructuring the Workforce Development unit was not recommended to her by anyone. (*See* Pl.'s Opp'n at 8; Walfoort Decl., Ex. 6 at 175–76.) According to plaintiff, the fact that PWC did not make such a recommendation is irreconcilably inconsistent with defendants' proffered legitimate and nondiscriminatory basis for terminating her employment, and thus amounts to pretext.

The inconsistency on which plaintiff attempts to rely does not appear to exist, however. Defendants' interrogatory response actually states that, "[a]s a result of the [PWC] review, Amtrak decided to outsource the supervisory/leadership programs" (Walfoort Decl., Ex. 25 at 4), and nowhere suggests that PWC made a specific recommendation regarding plaintiff's position as an HR Consultant. Contrary to plaintiff's assertion, the evidentiary record with respect to the PWC report does not undermine defendants' proffered basis for terminating her employment. (*See* Ford Decl., Ex. 29 at 77 (Hall deposition testimony in relation to questions regarding the decision to outsource leadership and supervisory training that "following

the findings of [PWC], [Amtrak] made a number of changes in Human Resources," and held regular meetings involving senior staff—including Porter—to "discuss transferring functions, reporting structures and the like").)

Further, although Porter did testify that she made the decision to restructure the Workforce Development unit, her testimony does not suggest that the decision was made in total isolation as plaintiff suggests. (*See* Pl.'s Opp'n at 8 ("Porter testified that she made the decision entirely on her own . . . .").) Indeed, Porter testified that she discussed her restructuring proposal with her supervisor, Gerri Hall, during several meetings [12] (*see* Ford Decl., Ex. 7 at 113–16), and arrived at her decision after having consulted with the three SBU presidents—Stan Bagley, Gill Mallory and Lee Bullock. (*See id.* at 131–32, 175–76.)

Because there are no substantive or material inconsistencies with respect to the PWC report and defendants' proffered explanation for its business decision, the report does not create a genuine issue of material fact regarding whether defendants' proffered explanation is mere pretext for unlawful racial or gender discrimination or otherwise could not be accepted.

## 2. Porter's selection of the American Management Association to provide the outsourced leadership and supervisory training

Plaintiff asserts that pretext is also established by alleged testimonial incon-sistencies between Porter and Hall. In contrast to Porter's testimony that she selected AMA to provide the outsourced leadership and supervisory training, Hall purportedly testified at her deposition that " 'the plan' was to use 'a *host of entities* that provide these type of programs all over the country.' " (Pl.'s Opp'n at 9 (emphasis in original).) Hall also testified that "[b]efore we really got into [outsourcing leadership and supervisory training] in terms of some regularity and really bolstering up that approach, [Amtrak] had yet another change in focus or vision of the company." (Walfoort Decl., Ex. 5 at 72–73; Pl.'s Opp'n at 9.) Further, Hall testified that she did not recall whether AMA provided any leadership training courses (*see* Walfoort Decl., Ex. 5 at 84; Pl.'s Opp'n at 10), and Porter was allegedly unaware of "any documents at Amtrak pertaining to AMA." (Pl.'s Opp'n at 10.)

Again, however, the inconsistencies on which plaintiff seeks to rely do not appear to exist. Hall did not testify during her deposition that "the plan" was to use a "host of entities," but instead testified that "the plan was to have [the outsourced leadership and supervisory training programs] function dependent on the need." (Walfoort Decl., Ex. 5 at 73.[13]) Hall then testified that "there are a host of entities that provide these types of programs all over

**12.** Plaintiff's allegation that Hall "denied discussing the proposal" with Porter (Pl.'s Stmt. Fact ¶ 148) is not supported by the record. Though Hall generally did not recall the specifics of any discussions with Porter regarding plaintiff's termination, she testified that Porter's November 1999 power point presentation "looked familiar" (Ford Decl., Ex. 29 at 82), that she was sure that she participated in the decision to outsource leadership and supervisory programs in her capacity as Assistant Vice–President (*see id.* at 76), and that the decision to terminate plaintiff's employment "would have been a collective decision in which [she] would have had a major role." (*Id.* at 106.) Moreover, plaintiff's suggestion that Hall fabricated her lack of recollection (*see* Pl.'s Opp'n at 9 n. 5) is conclusory and speculative.

**13.** Porter similarly testified that the decision to outsource leadership and supervisory training was in part based on the need to become more responsive to the SBUs by "target[ing]

the country ...." [14] (*Id.*) Plaintiff's effort to turn Hall's statement regarding the general existence of "a host of entities" into a declaration that Amtrak committed to using multiple organizations to provide the outsourced services is misleading and unconvincing.

Further, the fact that Amtrak "had a change in focus or vision" for the company and thus may not have utilized the AMA to the full extent originally proposed does not, without more, create any inconsistencies or suggest an intent by defendants to unlawfully discriminate against plaintiff. It is true that if Amtrak had not utilized the AMA or any other third party to provide leadership and supervisory training after it terminated plaintiff's employment, a material issue of fact might arise as to whether defendants' proffered decision was mere pretext for discrimination. Here, however, the record reflects that after Amtrak terminated plaintiff's employment, the AMA did in fact offer Amtrak employees multiple management and supervisory training courses. (*See* Ford Decl., Ex. 30 (Amtrak Education and De-

velopment Catalog for Summer 2000, Fall 2000, Spring 2001 and Fall 2001 listing management and supervisory courses provided by the AMA).) The record also reflects that Amtrak employees took advantage of the courses offered by the AMA.[15] (*See id.*, Ex. 31 (employee invoices for courses offered by the AMA or its divisions).[16])

Moreover, contrary to plaintiff's assertion, Porter did not testify that Amtrak was going to begin a "substantial relationship with [the] AMA" (Pl.'s Opp'n at 10), but rather testified regarding her reasons for selecting the AMA. Thus, there is no inconsistency between Porter's testimony regarding why she selected the AMA, and Hall's testimony regarding a later change in direction made some time after plaintiff's termination.

Plaintiff's evidence regarding the AMA again does not raise a material dispute about Amtrak's decision to outsource the Workforce Development unit's leadership and supervisory training program, or Porter's decision to rely on the AMA to provide

---

the training to their specific needs." (Ford Decl., Ex. 7 at 131–32.)

14. Hall's testimony in this regard is entirely consistent with Porter's testimony that she wanted to explore "national programs" that could support the objective of becoming more responsive to the SBUs' leadership and supervisory training needs. (*See* Ford Decl., Ex. 7 at 133.) Porter identified two of the programs she took under consideration—AMA and the USDA graduate school—and testified that she ultimately selected the AMA because it is national in scope, whereas the USDA graduate school was "not as widespread or didn't cover as much geography" as was needed for Amtrak's managerial population. (*See id.* at 134.)

15. Plaintiff's allegation that Porter was "unaware of any documents in the possession of Amtrak that pertained to [the] AMA" (Pl.'s Stmt. Fact ¶ 146; *see* Pl.'s Opp'n at 10) is not

supported by her citation to the record and ignores Porter's testimony about the AMA. Porter testified that the AMA invoiced Amtrak for the courses, she was responsible for making the courses available to employees through a training catalogue, and the Workforce Development unit tracked employee registration for and attendance at the AMA courses. (*See* Ford Decl., Ex. 7 at 149–152.)

16. In opposition to Amtrak's motion for summary judgment, plaintiff states that Amtrak untimely "produced documents suggesting Amtrak employees attended a number of training sessions offered by the AMA in 2000 and 2001" and asks that "those documents ... not be considered in resolving [Amtrak's] motion." (Pl.'s Opp'n at 10 n. 7.) However, plaintiff does not identify in her opposition to Amtrak's motion for summary judgment the documents to which she refers, and the court will not guess as to which documents she means.

such training, or show that either was pretext for racial or gender discrimination.

### 3. Paul Bello's hiring by Amtrak

■ Plaintiff alleges that defendants' proffered explanation for her termination is pretext because "[a]t the same time [Porter] was preparing to terminate [her], [Porter] ... developed a new position (Manager, Assessment and Measurement)[,]" [17] into which Porter "unceremoniously" placed Paul Bello, a white, male, non-disabled HR Consultant hired by Amtrak in May 1999. (*See* Pl.'s Opp'n at 17; Pl.'s Am. Compl. ¶¶ 13, 14.) Plaintiff contends that Amtrak never posted the newly created position, instead "simply mov[ing] Mr. Bello into it without competition" (Pl.'s Opp'n at 17), and continued to employ Bello at the time Amtrak terminated her employment. (*See* Pl.'s Opp'n at 13, 17.) In essence, plaintiff asserts that defendants' outsourcing explanation is pretext because, if the real reason for her termination was the restructuring of the Workforce Development unit, Amtrak would have also eliminated Bello's HR Consultant position. [18]

To prevail on this claim, plaintiff would need to demonstrate that she was similarly situated to Bello in all relevant aspects of employment. *See Holbrook v. Reno*, 196 F.3d 255, 261 (D.C.Cir.1999) (holding that in order for plaintiff to prove that she was similarly situated to three other employees, she had to "demonstrate that all of the relevant aspects of her employment situation were nearly identical to those" of the other employees) (citations and internal quotations omitted); *Barbour v. Browner*, 181 F.3d 1342, 1345 (D.C.Cir.1999) (same). The evidentiary record demonstrates that Amtrak hired Bello into his HR Consultant position because of his "[e]xperience in the design and development of automated systems to measure and track key performance indicators" (Ford Decl., Ex. 33), as well as his "[i]ndepth knowledge of transactional delivery systems ...." (*Id.*) His knowledge of training was a subsidiary factor. (*See id.*) Although plaintiff makes the allegation that the HR Consultant positions were fungible (*see* Pl.'s Opp'n at

---

**17.** Plaintiff's allegation that Porter created, and placed Bello in, the Manager of Assessment and Measurement position (*see* Pl.'s Stmt. Fact ¶ 172) is not supported by her citations to the record. Plaintiff does not cite to any testimony in the record to demonstrate that Porter in fact testified about creating a new position or having placed Bello into the position, but cites instead to a job posting for the position. (*See id.* (citing to Walfoort Decl., Ex. 29).) That job posting establishes neither the actual creation of the Manager, Assessment and Measurement position nor that Amtrak placed Bello into the position. More importantly, plaintiff admits that there is no evidence to establish that Bello assumed such a position:

> Bello's personnel records show that there is no change from his title as "Human Resources Consultant" in December 1999. In March 2000, his position changed from HR Consultant to Senior Manager.... In November 2001 he was Senior Manager, Test Administration.... There is no record

showing that he was "Manager of Assessment and Measurement" as reflected in the Position Description.

(Pl.'s Stmt. Fact ¶ 176 (internal citations omitted).)

**18.** Plaintiff's opposition does not suggest, as defendant apparently assumes, that she is challenging Bello's hiring in May 1999 as being a discriminatory act. Such an argument would fail because she offers no evidence to establish that she ever applied for the position. *See Morgan v. Fed. Home Mortgage Corp.*, 328 F.3d 647, 650 (D.C.Cir.2003) (stating that in order to demonstrate a *prima facie* case of discriminatory failure to hire, a plaintiff must show, among other things, " 'that [she] applied and was qualified for a job for which the employer was seeking applicants' ") (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).

12), other than her own conclusory statements, she offers no evidence—such as job descriptions for each HR Consultant position—to establish that her HR Consultant position was similar in all material respects to the position held by Bello. Because plaintiff has not demonstrated that she was similarly situated to Bello in all relevant aspects of employment, Amtrak's retaining Bello at the time the company terminated her employment does not support her claim of pretext.

### 4. Company-wide, performance-based downsizing initiative

Plaintiff argues that because her employment termination occurred when a "top-down downsizing, based on job performance evaluations ... was imminent" (Pl.'s Opp'n at 14), Amtrak's decision to restructure the Workforce Development unit has a "flavor of a preemptive measure" and "does not appear to be a rational or neutral business decision." (*Id.*) The "imminent" downsizing to which plaintiff refers was a corporate-wide initiative under which the HR Department as a whole would sustain a 10% performance based reduction-in-force. (*See* Walfoort Decl., Ex. 5 at 139–41.) In order for plaintiff's speculative assertion to have any merit, she would have to establish that in developing the restructuring proposal, Porter knew which employees in the Workforce Development unit, if any, would be affected by the reduction-in-force and, knowing that plaintiff was not in the at-risk 10% of HR Department employees, took deliberate action to eliminate her position on the basis of her race or gender. Plaintiff admits, however, that Porter "could not have known with certainty which employees she was in danger of losing" as a result of the performance based reduction-in-force. (Pl.'s Opp'n at 14.)

Because plaintiff presented no evidence to reasonably suggest that Porter's decision to restructure the Workforce Development unit was anything other than an independent, neutral business decision,[19] the evidence regarding the 10% performance based reduction-in-force does not help plaintiff establish that defendants' proffered explanation for plaintiff's termination is pretextual.

### 5. Relocation of plaintiff's duties to Delaware

Plaintiff argues that her duties were not outsourced as defendants claim, but rather were relocated to a position in Delaware. (*See* Pl.'s Opp'n at 19–20.) To support her arguments, plaintiff relies on the following testimony of Michael Ramirez:

Q: Not test development, but training development?

A: Not test, but training development.

---

19. Unrelated to the performance-based downsizing initiative, plaintiff also asserts that Amtrak disregarded the terms of a consent decree while implementing Porter's Workforce Development unit restructuring proposal because the company failed to conduct a disparate impact analysis before terminating her employment, thus "lend[ing] strength to the inference that she was not regretfully terminated" due to the nondiscriminatory business justification proffered by Amtrak (restructuring the Workforce Development unit). (*See* Pl.'s Opp'n at 21–22.) A June 21, 2000 consent decree in *McLaurin v. National R.R. Passenger Corp.,* Civil Action No. 98–2019(EGS) (D.D.C.), signed *nunc pro tunc* to September 2, 1999, requires Amtrak to "perform an analysis" of any reduction-in-force it intends to implement to "determine if it will have a disparate impact on African American Management employees." (Walfoort Decl., Ex. 27 at 18.) Plaintiff, however, presented no evidence to demonstrate that she fell within the meaning of "Management employee" as the term is defined in the consent decree. (*See* Walfoort Decl., Ex. 27 at 4 (" 'Management employees' ... means employees or positions not subject to a collective bargaining agreement ..., and not on the Amtrak Management Committee.").)

Q: And do you know about how many jobs?

A: One maybe, two perhaps, one for sure.

Q: Okay. And the one or two jobs were in training development?

A: Yes.

Q: And when you say one for sure, are you thinking of a particular individual's job?

A: Yes.

Q: What individual was that?

A: The position that—an employee by the name of Elayne Mitchell.

Q: Okay. And that position was moved up to the Wilmington training center?

A: Yes.

(Walfoort Decl., Ex. 13 at 94.)

Out of context, this limited excerpt shows little. Plaintiff provides no preceding or succeeding excerpts to show, for example, whether Ramirez's testimony was in response to questions specifically about continued leadership and supervisory training by Amtrak, or general questions about training development. Plaintiff supports her insinuation that the Wilmington HR Consultant position was not a "new" position, but instead was the position she held in the Workforce Development unit, with no objective evidence from which such an inference can be made, such as a comparison of job descriptions for the position she held before her termination versus the Wilmington position that Amtrak posted in January 2000. Indeed, on its face, the Wilmington HR Consultant job description does not contain any references to leadership and supervisory training responsibilities as a component of the position. (*See* Ford Decl., Ex. 38.) Even accepting as

true that Ramirez's testimony suggests Amtrak moved aspects of plaintiff's job to Wilmington after terminating her employment,[20] it does not, without more, suggest that Amtrak also moved its leadership and supervisory training there—as opposed to outsourcing it to the AMA as Porter originally conceived.

Plaintiff also argues that the fact that the company did not specifically solicit her application for and transfer her into the Wilmington HR Consultant position somehow shows that defendants' explanation for her termination is false and is pretext for discrimination. (*See* Pl.'s Opp'n at 20–21.) Why Amtrak *sua sponte* should have placed plaintiff in the position she has not shown was comparable to hers is not apparent. In any event, plaintiff does admit that Amtrak informed her that she could seek employment elsewhere within the company during her two week notice period in January 2000. (*See* Ford Decl., Ex. 5 at 128.) According to Amtrak, there were five openings in the HR Department in January 2000, and two of those openings were for the position of HR Consultant. (*See* Walfoort Decl., Ex. 10 at 3 and Ex. 11 at 3; Pl.'s Stmt. Fact ¶ 168.) The Wilmington HR Consultant position was one of the vacant positions. (*See* Pl.'s Stmt. Fact ¶ 168; *see also* Ford Decl., Ex. 38 (job posting for Wilmington HR Consultant position with a posting date range from January 12, 2000 to January 19, 2000).)

Plaintiff testified during her deposition that she "called the [HR] office to find out what was posted" with respect to job openings (Ford Decl., Ex. 5 at 128; *see* Walfoort Decl., Ex. 3 ¶ 25), but admits that she never applied for any Amtrak job openings after Amtrak provided her with a termi-

---

**20.** Plaintiff has not even shown the time peri-

od to which Ramirez's testimony applies.

nation notice letter on January 7, 2000.[21] (*See* Ford Decl., Ex. 5 at 133–34.). According to plaintiff, however, she was not provided information about the Wilmington HR Consultant position (*see* Pl.'s Stmt. Fact ¶ 165), thus precluding her from applying for the open position. Yet, even accepting her assertion as true, she fails to establish how such a lack of notification is in any way linked to defendants' decision to terminate her employment in the first instance, let alone that the lack of notification was because of her race or gender.

Plaintiff's evidence is insufficient to permit a reasonable inference that the position from which she was terminated was reconstituted as the Wilmington HR Consultant position and not outsourced. Nor is there any evidence that Amtrak purposefully denied her the opportunity to apply for the Wilmington position. Accordingly, plaintiff's assertions regarding the Wilmington HR Consultant position do not establish that Amtrak's proffered explanation for her termination is pretext for racial or gender discrimination.

### 6. Disparate severance packages

■ Plaintiff also argues that pretext is demonstrated because Amtrak offered her a severance package that was not the same as the severance packages offered other employees terminated by Amtrak. (*See* Pl.'s Opp'n at 30–31.) She argues— by inference—that instead of the eight weeks severance pay Amtrak offered her, she should have been offered the same six-months severance pay that Amtrak offered two white employees whose jobs were eliminated in 2000 and 2001. (*See id.* at 30–31.[22]) Plaintiff further alleges that, whereas her eight weeks severance pay package was contingent upon her agreement not to seek future employment at Amtrak, "a (white female) employee terminated a month after [she was] had no such proscription." (*Id.* at 31.)

In order to permit the inference plaintiff urges, she must demonstrate that Amtrak offered severance packages that contained more advantageous terms to other employees similarly situated in all relevant aspects of employment. *See Holbrook v. Reno,* 196 F.3d 255, 261 (D.C.Cir.1999); *Barbour v. Browner,* 181 F.3d 1342, 1345 (D.C.Cir.1999). Here, however, plaintiff's evidence of disparate treatment does not involve similarly situated employees. The employee plaintiff refers to as a "white

---

21. It is for this reason that there is no probative value in plaintiff's allegation that Amtrak treated white male employees—Glen Stickler, Thomas Wiley and Barry Warner—more favorably by assigning or transferring them to other positions when the company eliminated their positions. (*See* Pl.'s Opp'n at 19.) These individuals all applied for the positions into which they were placed. (*See* Ford Decl., Ex. 40, Ex. 41 and Ex. 42.)

22. Plaintiff also alleges that Amtrak did not utilize a "standard" formula to calculate the severance pay terminated employees received in association with Amtrak's 2000 performance based reduction-in-force. (*See* Pl.'s Stmt. Fact ¶ 212; Pl.'s Opp'n at 30.) Plaintiff cites Hall's deposition in which Hall testified that "the release agreement [in the 2000 performance based reduction-in-force] was short-er than the release agreements used in other restructurings" and she believed the terms to be "less generous." (Walfoort Decl., Ex. 5 at 175.) Hall further testified that, although she did not specifically recall, she "would have anticipated that the language saying [that the terminated employees were] not going to reapply would have been there." (*Id.*) If any inference is to be drawn from Hall's testimony regarding severance pay packages, it is that the terms of the severance package Amtrak offered plaintiff were more generous than those offered to the employees who lost their jobs during the 2000 performance based reduction-in-force. The fact that Amtrak treated plaintiff more favorably than later terminated employees does not advance her pretext argument.

male" who purportedly received a more generous six-month severance payment at the time Amtrak terminated "his" employment (*see* Pl.'s Opp'n at 30; Pl.'s Stmt. Fact ¶ 210; Walfoort Decl., Ex. 35) was in fact an African–American female who was a Vice–President of Human Resources in the NEC and whom this opinion will refer to as "SW." [23] (*See* Ford Decl., Ex. 44, Ex. 45.) Contrary to plaintiff's statement that SW "worked the same number of years" as plaintiff did (*see* Pl.'s Opp'n at 30–31), Amtrak in fact hired SW in May 1980, almost sixteen years before the company hired plaintiff. (*See* Ford Decl., Ex. 44.) Plaintiff has not demonstrated that she is similarly situated to SW in all material respects.

Nor has plaintiff demonstrated that she is similarly situated to the white female employee—to be referred to here as "CO"—whom Amtrak purportedly terminated "a month after [she was]" with no "provision barring re-application" with Amtrak. (*See* Pl.'s Opp'n at 31.) CO was Amtrak's Corporate Medical Director (*see* Walfoort Decl., Ex. 5 at 184; Ford Decl., Ex. 46 at 1), whose position Amtrak terminated in November 2001 (*see* Walfoort Decl., Ex. 5 at 194; Ford Decl., Ex. 46 at 1), almost two years after Amtrak terminated plaintiff's employment. Further, contrary to plaintiff's assertion, CO's signed release agreement plainly stated that, "[i]n exchange for the benefits offered by Amtrak, [CO] agrees … not to seek employment with Amtrak in the future." (Ford Decl., Ex. 46 at 2.) Plaintiff was not similarly situated to CO in all material respects. Accordingly, because plaintiff has not offered any evidence that Amtrak treated similarly situated employees in a more favorable manner upon termination,[24] her evidence regarding her severance package does not demonstrate that defendants' proffered explanation for her termination is mere pretext for racial or gender discrimination.[25]

### 7. Disparate duties and opportunities

Plaintiff claims she was fired because Porter set her up to fail.[26] While this allegation is conclusory and speculative and does not create a genuine issue of material fact regarding whether defendants' proffered explanation is mere pre-

---

**23.** Plaintiff attaches as an exhibit to the Walfoort Declaration only the first page of the severance package Amtrak offered SW in November 1999 (*see* Walfoort Decl., Ex. 35), glaringly omitting the last two pages. As those omitted pages make plain, Amtrak included as a condition of SW's receiving the six-month severance payment that she "agree not to seek employment with Amtrak in the future." (Ford Decl., Ex. 47 at 2.)

**24.** Notably, moreover, plaintiff fails to explain how the terms of her January 2000 severance package demonstrate the existence of discriminatory motive in November 1999 when Porter decided to restructure the Workforce Development unit, particularly when there is no evidence to demonstrate Porter's involvement in preparing plaintiff's severance package. (*See* Ford Decl., Ex. 43 at 29, 125–26, 143, 184–86, 190 (Ramirez's testimony that, after

receiving instruction from Gerri Hall, it was his responsibility to prepare plaintiff's severance package a few days before Amtrak eliminated her position).)

**25.** Nor does plaintiff's evidence regarding the six circumstances above that she proffered to rebut Amtrak's neutral explanation for her termination demonstrate pretext with respect to her age discrimination in termination claims in Count II.

**26.** She complains that her relationship with Porter "deteriorated over time" and "[became] increasingly bad" (Pl.'s Stmt. Fact ¶ 124), and that Porter "interfered with [plaintiff's] performance of her duties" (*id.* ¶ 125) and "did not allow [her] to respond to requests for training and assistance from personnel in Corporate HR or from the directors of the SBUs." (*Id.* ¶ 126.)

text for discrimination, *see Harding v. Gray*, 9 F.3d 150, 154 (D.C.Cir.1993); *Sage v. Broadcasting Publ'ns, Inc.*, 997 F.Supp. 49, 53 (D.D.C.1998); *McCain v. CCA of Tenn., Inc.*, 254 F.Supp.2d 115, 119 (D.D.C.2003), plaintiff has alleged facts which, if believed, could be reasonably used by a jury to find intentional discrimination against plaintiff in her termination. Porter allegedly required plaintiff "to accomplish ten customer service training sessions, whereas her white male counterparts [Bello and Stickler] were expected to conduct only three to five." (Pl.'s Stmt. Fact. ¶ 124.) She further alleges that Porter "transferred [plaintiff's] responsibility for evaluation and measurement to Mr. Bello, and [her] customer service duties to Glen Stickler" and did not allow her to attend certain training sessions that Bello and Stickler were allowed to attend. (*Id.* ¶ 125.)[27] Plaintiff's allegation that Porter "did not appear to be threatened by ... male employees" (Walfoort Decl., Ex. 3 ¶ 20), could further support her claim that defendants' proffered explanation for her termination is mere pretext.[28]

■ Although Porter and Green are both African–American, plaintiff's claim of racial discrimination against them does not fail as a matter of law. Intra-racial discrimination is actionable under § 1981. *Saint Francis Coll. v. Al–Khazraji*, 481 U.S. 604, 609–10, 612–13, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987); *see also Hansborough v. City of Elkhart Parks & Recre-*

ation Dept., 802 F.Supp. 199, 206 (N.D.Ind.1992)(holding, in a Title VII case but relying on § 1981 cases, that the issue is not the plaintiff's physical characteristics, but whether he was discriminated against by other African–Americans "because he was born black"); *Franceschi v. Hyatt Corp.*, 782 F.Supp. 712, 723 (D.P.R. 1992) (holding that the plaintiff "will be entitled to recovery if he convinces the trier of fact that Puerto Ricans discriminated against him because he was born ... Puerto Rican"); *Walker v. Sec'y of the Treasury*, 713 F.Supp. 403, 408 (N.D.Ga. 1989) (holding that in a § 1981 case it "not controlling that ... a black person is suing a black person"). Contrary to Porter and Green's contention that only "sub-group" intra-racial discrimination is actionable, such as white defendants acting against a white Arab, or light-skinned black defendants acting against a dark-skinned black plaintiff (Mot. to Dismiss at 11 n. 5), § 1981 is a broad prohibition of racial discrimination, and "a distinctive physiognomy is not essential to qualify for § 1981 protection." *Saint Francis Coll.*, 481 U.S. at 613, 107 S.Ct. 2022.

■ Viewing this evidence in a light most favorable to plaintiff, she has placed in issue sufficient material facts to be entitled to have a jury resolve whether the basis for plaintiff's termination was race or gender discrimination in violation of Title VII or § 1981.[29] Amtrak's motion for

---

27. In their motion to dismiss, Green and Porter argue that the plaintiff has not stated a claim of discrimination under § 1981 because plaintiff failed to allege that they intentionally discriminated against the plaintiff. (Def.'s Mot. to Dismiss at 12.) The plaintiff did allege, however, that Porter began to strip plaintiff of her duties and transfer her work to Bello because he was a white male. (*See* Pl.'s Am. Compl. ¶ 13.) This does not, as Green and Porter assert, "fall short" of a sufficient allegation.

28. Plaintiff suggests that because "Porter saw the arrival of two African–American women, Ms. Green and Ms. Hall, into the HR Department" during her tenure as Director of the Workforce Development unit, Porter developed a bias against plaintiff, "another African–American woman at her heels ...." (Pl.'s Opp'n at 16–17.)

29. Plaintiff's evidence does not suffice, however, to demonstrate pretext or age discrimination in connection with her ADEA termination claim in Count II.

summary judgment on plaintiff's race and gender discrimination in termination claim in Counts I and III and defendants Green and Porter's motion for summary judgment on plaintiff's race discrimination claim in Count I therefore will be denied.

## B. *Age discrimination under the ADEA*

■ Amtrak does not dispute that plaintiff has made out a *prima facie* case of age discrimination in violation of the ADEA with respect to her discriminatory termination claim. (*See* Defs.' Mem. Supp. Summ. J. at 12.) In response to plaintiff's *prima facie* case, Amtrak argues that it terminated plaintiff's employment due to a business decision to restructure the Workforce Development unit. Because, as is discussed above, Amtrak's proffered explanation is legitimate and non-discriminatory, the burden shifts under the *McDonnell Douglas* framework to plaintiff to demonstrate that the proffered explanation is mere pretext for discrimination. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

■ To demonstrate pretext with respect to her age discrimination in termination claim, plaintiff offers the same arguments and evidence discussed above concerning her race and gender discrimination in termination claim. As was determined above, that evidence does not demonstrate pretext with respect to plaintiff's age discrimination in termination claim.

Plaintiff's other evidence of pretext with respect to the age claim is that (1) "[she] was the oldest employee" in the Workforce Development unit (*see* Walfoort Decl., Ex. 3 ¶ 12); (2) the decisionmakers—Porter, Green and Hall—were 13 to 27 years younger than she was at the time Amtrak terminated her employment (*see id.*; Pl.'s Opp'n at 3 n. 3); and (3) Bello was 18 years younger than plaintiff was and was not terminated in January 2000 as part of Porter's efforts to restructure the Workforce Development unit.

Even accepting as true plaintiff's current representations regarding the age disparity[30] between herself, on the one

---

**30.** Plaintiff asserts in opposition to Amtrak's motion for summary judgment that her actual date of birth is November 27, 1932 (*see* Pl.'s Stmt. Fact ¶ 2; Walfoort Decl., Ex. 1), which would mean she was 67 years old at the time Amtrak terminated her employment. It is undisputed, however, that when Amtrak hired plaintiff, she represented to the company that her date of birth was November 27, 1940 (*see* Ford Decl., Ex. 2.), and that she made no effort to inform Amtrak of her correct age before Amtrak terminated her employment. (*See* Defs.' Stmt. Fact ¶ 6; *see also* Ford Decl., Ex. 5 at 170–71 (plaintiff's deposition testimony that she had "not been totally truthful" about her age before and during her employment with Amtrak and that she began to correct that "little white lie" only after Amtrak terminated her employment).) It also appears, much to this Court's distress, that plaintiff knowingly has made multiple false representations about her age in official proceedings where her age was a material element of her cause of action against her opponent. Plaintiff represented to the Equal Employment Opportunity Commission that she was 58 years old on September 5, 2000, putting her date of birth on or after September 6, 1942 (*see* Ford Decl., Ex. 3 ¶ 1), and similarly represented in her initial complaint filed in this case that she was 59 years old on August 30, 2001. (*See id.*, Ex. 4 ¶ 5.) Plaintiff continued to represent to this Court that her date of birth was sometime in late 1942 up until at least January 2002. (*See* Pl.'s Opp'n Mot. Dismiss at 2.) Whether this Court should decline to even entertain plaintiff's age claims in light of this misconduct is a question that will be left for another day. Nevertheless, because plaintiff cannot establish pretext with respect to her ADEA claims irrespective of her date of birth, it is not necessary to determine what, if any, effect plaintiff's "little white lie" would otherwise have on her claims.

hand, and Porter, Green, Hall and Bello, on the other, she fails to offer any additional evidence—such as independent evidence of discriminatory attitudes or statements attributable to Amtrak—that supports her ultimate burden of having to prove that Amtrak intentionally discriminated against her because of her age. *See Dunaway v. Int'l Bhd. of Teamsters,* 310 F.3d 758, 763 (D.C.Cir. 2002); *Aka v. Washington Hosp. Ctr.,* 156 F.3d 1284, 1289 (D.C.Cir.1998). The record is devoid of any evidence to suggest that plaintiff's age "actually motivated [Amtrak's] decision" to terminate her employment or had "a determinative influence on the outcome." *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993).

Accordingly, because plaintiff cannot establish that Amtrak's proffered legitimate and non-discriminatory basis for terminating her employment in January 2000 is mere pretext for age discrimination, Amtrak's motion for summary judgment on plaintiff's age discrimination in termination claim in Count II will be granted.

## C. *Perceived disability under the ADA*

 In Count IV, plaintiff alleges that Amtrak violated the ADA when it terminated her employment as an HR Consultant because Amtrak perceived her as disabled. (*See* Pl.'s Am. Compl. ¶ 37.[31]) Under the *McDonnell Douglas* burden shifting framework applicable to ADA claims, *see Marshall,* 130 F.3d at 1099, plaintiff has the initial burden of establishing a *prima facie* case [32] by demonstrating that Amtrak regarded her as having "a physical or mental impairment that substantially limit[ed] one or more of [her] major life activities ...." 42 U.S.C. §§ 12102(2)(C), 12102(2)(A); *see Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 489, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). In order to fall within the ADA's definition of being regarded as having a physical impairment, plaintiff must establish that Amtrak (1) mistakenly believed that she had a physical impairment that substantially limited one or more major life activities, or (2) mistakenly believed that an actual, nonlim-

**31.** In her opposition to Amtrak's motion for summary judgment, plaintiff seeks for the first time to add a claim against Amtrak under the ADA on the alleged basis that the company unlawfully terminated her employment and refused to re-hire her because she is "actually disabled." (Pl.'s Opp'n at 38–43.) Plaintiff's amended complaint plainly limits her ADA claims in Count IV to an alleged unlawful termination "on the basis of a perceived physical disability" and an alleged failure to re-hire her in favor of another employee "who was not regarded as having a disability." (Pl.'s Am. Compl. ¶¶ 37, 38.) Plaintiff's failure to amend her complaint under Fed. R.Civ.P. 15(a) bars such a new ADA claim against Amtrak at this late stage of the proceedings. *Cf. Armstrong v. Reno,* 172 F.Supp.2d 11, 24 (D.D.C.2001) (not allowing plaintiff to assert at summary judgment stage a constructive discharge claim that was not raised in plaintiff's complaint). More importantly, "[b]efore bringing suit in federal court, ADA plaintiffs ... must exhaust their administrative remedies by filing an EEOC charge and giving that agency a chance to act on it." *Marshall v. Fed. Express Corp.,* 130 F.3d 1095, 1098 (D.C.Cir.1997). Plaintiff offers no evidence to establish that she raised her "actually disabled" claim with the EEOC or D.C. Office of Human Rights. (*See* Ford Decl., Ex. 23 ¶¶ 3, 5, 9, 10, 13 (plaintiff's EEOC affidavit setting forth claims of unlawful discrimination under the ADA solely on the alleged bases that Amtrak regarded her as having a disability or treated other employees more favorably because the company did not regard them as being disabled).) Plaintiff's "actually disabled" claims therefore will not be considered in opposition to Amtrak's motion for summary judgment.

**32.** Amtrak does not concede that plaintiff has established a *prima facie* case of perceived disability discrimination under the ADA.

iting impairment substantially limited one or more of her major life activities. *See Sutton,* 527 U.S. at 489, 119 S.Ct. 2139.

■ To establish that Amtrak ran afoul of the ADA when it terminated her employment on the basis of a perceived disability, *see id.* at 490, 119 S.Ct. 2139, plaintiff asserts that Porter was aware that she "used a special chair for her back, walked with a limp, could not stand or walk for long periods of time, and regularly attended physical therapy sessions . . . ." (Pl.'s Opp'n at 43.) Plaintiff further asserts that Porter regarded her as disabled because she informed Porter in December 1999 that she needed surgery. (*See* Pl.'s Am. Compl. ¶ 15; Pl.'s Opp'n at 42, 43.)

It is undisputed that, "at various times, [Porter and plaintiff] talked about [their] back problems." (Walfoort Decl., Ex. 6 at 233). It is also undisputed that Porter "was aware that [plaintiff] periodically had pains" and knew that Amtrak provided her with an oversized chair. (*Id.* at 233–234.) Yet that is the only evidence—other than her own conclusory statements—that plaintiff advances to demonstrate that Amtrak regarded her as being disabled.[33] She does not allege, nor does she present any evidence, that she provided Porter or Amtrak with any medical records or informed Porter or the company that she considered herself disabled within the meaning of the ADA.[34] Nor does she present evidence that anyone at Amtrak mistakenly believed either that she had a physical impairment that substantially limited any major life activity, or that an actual nonlimiting impairment she had substantially limited a major life activity. Porter's admitted knowledge of plaintiff's back problems and Amtrak having provided plaintiff with an oversized chair does not, without more, establish that she or any other Amtrak employee perceived plaintiff as disabled within the meaning of the ADA. *See, e.g., Haulbrook v. Michelin N. Am.,* 252 F.3d 696, 703 (4th Cir.2001) (holding that an employer's awareness of an employee's impairment, without more, is insufficient to demonstrate that the employer regarded the employee as disabled); *Kellogg v. Union Pac. R.R. Co.,* 233 F.3d 1083, 1089 (8th Cir.2000) (same); *Reeves v. Johnson Controls World Servs., Inc.,* 140 F.3d 144, 153 (2d Cir.1998) (same); *Kelly v. Drexel Univ.,* 94 F.3d 102, 109 (3d Cir. 1996) (same); *Simonson v. Trinity Reg'l Health Sys.,* 336 F.3d 706, 709 (8th Cir. 2003) (holding that an employer's awareness of "[plaintiff's] past medical problems does not establish that it regarded her as disabled"); *Benoit v. Technical Mfg. Corp.,* 331 F.3d 166, 176 (1st Cir.2003) (holding that plaintiff's complaint of back pains and request for "simple stands to assist with lifting" made to his employer were insuffi-

---

**33.** A plaintiff's bare conclusory assertions are insufficient to support her burden of establishing a *prima facie* case of perceived disability discrimination under the ADA. *See Harding v. Gray,* 9 F.3d 150, 154 (D.C.Cir.1993); *Sage v. Broadcasting Publ'ns, Inc.,* 997 F.Supp. 49, 53 (D.D.C.1998); *McCain v. CCA of Tenn., Inc.,* 254 F.Supp.2d 115, 119 (D.D.C.2003).

**34.** Plaintiff offers no objective evidence—such as medical records or deposition testimony from her doctor or former Amtrak co-workers—to support her claims that she was diagnosed with degenerative arthritis in June 1999, could stand or walk only for short periods of time, attended therapy sessions while an Amtrak employee, or walked with a limp. Nor does she present any evidence to support her assertion that her doctor recommended surgery in December 1999. The only medical evidence in the record perhaps shows that plaintiff's doctor, Dr. Emad Zeitouneh, discussed with her "degenerative changes" in her physical condition on December 10, 1999 (*see* Ford Decl., Ex. 25) and recommended physical therapy on May 24, 2000 (*see id.*), but none of the medical records even mention surgery as a possibility.

cient to establish that the employer regarded him as disabled because "he at no point indicated to [the employer] that he was disabled within the meaning of the ADA"); *Thornton v. McClatchy Newspapers, Inc.*, 261 F.3d 789, 798 (9th Cir.2001) (holding that when an employer takes steps to accommodate an employee's restrictions, it is not thereby conceding that the employee is disabled under the ADA or that it regards the employee as disabled).

Because plaintiff has not made out a *prima facie* case that Amtrak terminated her employment in January 2000 on the basis of a perceived disability in violation of the ADA, Amtrak's motion for summary judgment on plaintiff's claim that she was terminated based upon a perceived disability in Count IV will be granted.

### D. *DCHRA*

■ Green and Porter claim that they cannot be held individually liable under the DCHRA. The DCHRA states, with regard to race, age, gender and disability discrimination:

> It shall be an unlawful discriminatory practice to do any of the following acts, wholly or partially for a discriminatory reason based upon the race, . . . sex, age, . . . [or] disability . . . of any individual:
>
> > 1) *By an employer.*—To fail or refuse to hire, or to discharge, any individual; or otherwise to discriminate against any individual, with respect to his compensation, terms, conditions, or privileges of employment . . . .

D.C.Code Ann. § 2–1402.11(a)(1) (emphasis in original). District of Columbia and federal courts often rely upon decisions of the federal courts in Title VII, § 1981, ADEA, and ADA cases to aid in construing the DCHRA. *See Chang v. Inst. for Pub.-Private P'ships, Inc.*, 846 A.2d 318, 324 (D.C.2004) (ADA); *Lively v. Flexible Packaging Ass'n*, 830 A.2d 874, 887–88 (D.C.2003) (Title VII); *McManus v. MCI Communications Corp.*, 748 A.2d 949, 956 n. 7 (D.C.2000) (ADEA); *Daka, Inc. v. Breiner*, 711 A.2d 86, 94 (D.C.1998) (Title VII); *Villines v. United Bhd. of Carpenters & Joiners of Am., AFL–CIO*, 999 F.Supp. 97, 102 n. 21 (D.D.C.1998) (§ 1981); *Carney v. Am. Univ.*, 960 F.Supp. 436, 449 (D.D.C.1997) (§ 1981), *aff'd in part, rev'd in part on other grounds*, 151 F.3d 1090 (D.C.Cir.1998). For example, the District of Columbia Court of Appeals in DCHRA cases has adopted "'the same three-part, burden-shifting test articulated by the Supreme Court for Title VII cases in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)[,]'" *Futrell v. Dep't of Labor Fed. Credit Union*, 816 A.2d 793, 802 (D.C.2003) (age and race claims) (quoting *Hollins v. Fed. Nat'l Mortgage Ass'n*, 760 A.2d 563, 571 (D.C. 2000)); *RAP, Inc. v. D.C. Comm'n on Human Rights*, 485 A.2d 173, 176–77 (D.C. 1984) (sex claim); followed federal cases in recognizing a cause of action for an age-based hostile work environment claim, *Daka, Inc.*, 711 A.2d at 95; adopted federal elements of a sexual harassment claim, *Howard Univ. v. Best*, 484 A.2d 958, 978 (D.C.1984); and followed federal Title VII precedent to enforce an agreement to arbitrate employment discrimination claims. *Benefits Communication Corp. v. Klieforth*, 642 A.2d 1299, 1304 (D.C.1994).

The District of Columbia Court of Appeals has consistently said, however, that it would adopt in DCHRA cases federal civil rights precedents "when appropriate," not indiscriminately. *Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d 873, 889 n. 31 (D.C.1998) (quoting *Klieforth*, 642 A.2d at 1301); *see also Arthur Young & Co. v. Sutherland*, 631 A.2d 354,

371–72 (D.C.1993) (permitting, given the text of the DCHRA and its legislative history, punitive damages awards despite their unavailability under Title VII, and noting that "Title VII is not the only source of the DCHRA"). And in *Wallace*, the court held that although individual employees cannot be held liable under Title VII, the text and history of the DCHRA suggest no similar bar.

■ The DCHRA's definition of employer is broader than Title VII's and includes "any person acting in the interest of such employer, directly or indirectly." D.C.Code Ann. §§ 2–1401.02(10). The DCHRA also makes it unlawful to aid and abet, or to attempt, any of the discriminatory acts forbidden by the statute. *Id.* § 2–1402.62. These textual provisions "find[ ] no analogue in the federal statute." *Wallace*, 715 A.2d at 889. Thus, *Wallace* held that law firm partners alleged to have participated in unlawful discriminatory conduct could be held liable individually. *Id.*; *see also Lance v. United Mine Workers of Am.1974 Pension Trust*, 400 F.Supp.2d 29, 31 (D.D.C.2005) (holding individual defendants subject to suit); *MacIntosh v. Bldg. Owners & Managers Ass'n Int'l*, 355 F.Supp.2d 223, 227–228 (D.D.C.2005) (holding plaintiff's supervisor subject to suit). This result was unremarkable since the DCHRA, as a remedial statute, "must be generously construed[,]' " *Wallace*, 715 A.2d at 889 (quoting *Simpson v. District of Columbia Office*

*of Human Rights*, 597 A.2d 392, 398 (D.C. 1991)), and its "primary purpose [was] to eradicate all employment discrimination[.]" [35] *Daka*, 711 A.2d at 94. The text and purpose of the DCHRA, and *Wallace*, do not suggest that it would be appropriate to follow Title VII here and preclude a claim against individual management and supervisory employees involved in committing the allegedly discriminatory conduct. [36] Green and Porter, then, are proper defendants in plaintiff's DCHRA claim.

■ As is discussed above with respect to her federal discriminatory termination claims, plaintiff has neither demonstrated that Amtrak's proffered legitimate and non-discriminatory justification for her January 2000 termination is mere pretext for unlawful age discrimination, nor established a *prima facie* case of perceived disability discrimination. [37] Because Amtrak is entitled to judgment as matter of law under the *McDonnell Douglas* burden shifting framework on plaintiff's termination claims under the ADEA and the ADA, judgment also will be granted to defendants on her claims in Count V that they unlawfully discriminated against her on the basis of age and perceived disability in violation of the DCHRA when the company terminated her employment in January 2000. Because plaintiff's federal claims of race and gender discrimination regarding her termination survive summary judgment, defendants' motion will be

**35.** Title VII, by contrast, exempts from its prohibitions a host of employers. See 42 U.S.C. § 2000e(b).

**36.** *Hunter v. Ark Rests. Corp.* held that individuals cannot be held liable under the DCHRA. 3 F.Supp.2d 9, 15–17 (D.D.C.1998). However, that case was decided before the final *Wallace* opinion was published.

**37.** Perceived disability causes of action are recognized under the DCHRA, *see Chang*, 846

A.2d at 324, and are scrutinized under the same standards that are enunciated in *Sutton*. *See id.* (recognizing that "[t]he Supreme Court has held that 'a person is "regarded as" disabled within the meaning of the ADA if a covered entity mistakenly believes that the person's actual, nonlimiting impairment substantially limits one or more major life activities' ") (quoting *Murphy v. United Parcel Serv.*, 527 U.S. 516, 521–22, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999) (citing *Sutton* )).

denied as to plaintiff's corresponding DCHRA claims in Count V.

## II. THE NEC MANAGER POSITION

### A. *Race and gender discrimination under Title VII and § 1981*

 With regard to plaintiff's discriminatory failure to hire claim, Amtrak again does not dispute that plaintiff has established a *prima facie* case of race and gender discrimination under Title VII and § 1981. (*See* Defs.' Mem. Supp. Summ. J. at 27.) To rebut plaintiff's *prima facie* case, Amtrak proffers that the decision-maker for the NEC Manager position, Rose Bacchus, did not offer plaintiff the position because she and Ramirez considered her among the weakest of the interviewees for the NEC Manager position. Bacchus testified that interviews were more important than the candidates' paper credentials in her determination of whom to hire for the NEC Manager position. Amtrak thus asserts that because Bacchus and Ramirez ranked plaintiff at or near the bottom of the candidates following their interviews, she was not offered the NEC Manager position.

"Selecting a pool of qualified candidates based upon their written credentials and then making a final selection based upon personal interviews is an obviously reasonable method of hiring a professional employee." *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183–84 (D.C.Cir.1996). Indeed, where, as here, the candidates meeting the minimum qualifications were pre-chosen for the interview based on their applications and resumes, "[t]here is nothing the least bit fishy about the interviewers' giving slightly less emphasis to the applicant's credentials than to the manner in which each candidate proposed to do the job …." *Id.* at 1184. Amtrak's proffer—that Bacchus relied on the results of the interviews for choosing the NEC Manag-

er—is a reasonable and nondiscriminatory justification for its business decision. *See id.* at 1182. Plaintiff must therefore offer evidence that Amtrak's proffered reason is mere pretext for unlawful discrimination.

Plaintiff asserts that pretext is established for several reasons: (1) the job requirements and qualifications listed in the job posting did not include the characteristics and qualities Bacchus testified that she was looking for in filling the NEC Manager position (*see* Pl.'s Opp'n at 23, 25); (2) Bacchus and Ramirez provided conflicting testimony regarding whether they considered race and gender as factors in selecting the NEC, Intercity and West Manager positions (*see id.* at 27); (3) Bacchus's testimony regarding how she selected the NEC Manager and to whom she offered the job is not supported by the record (*see id.* at 26); and (4) Amtrak did not follow its policy that requires internal applicants to have satisfactorily performed in their current positions for at least one year before being eligible for consideration for another Amtrak position. (*See id.* at 23, 26.)

### 1. The NEC Manager job posting

 Plaintiff asserts that pretext is established because the qualifications and characteristics that Bacchus looked for in an NEC Manager did not comport with the job description and qualifications set forth in the October 1999 NEC Manager job posting. According to the job posting, the NEC Manager was responsible for administering and coordinating company sponsored employee services, often conducting difficult employee counseling sessions regarding salary, promotion, hiring, job classification, performance and termination decisions. The job posting further required of a candidate creative and effective written, oral presentation and verbal

interchange skills, as well as an ability to work well with senior staff.

When asked about the qualifications she was looking for in an NEC Manager, Bacchus testified that it was important for the manager to be able to listen to and communicate with all levels of people in a variety of situations, to know where Amtrak's lines of division occur and to establish professional networks within various parts of the company. The NEC Manager also needed to be "able to reach out and bring the appropriate people together to expedite things getting done." (Ford Decl., Ex. 13 at 31.) Bacchus further believed that the NEC Manager had to have the ability to use discretion, good judgment and maturity in dealing with individual personalities.

Bacchus's testimony is not inconsistent with the job description and qualifications set forth in the job posting. The NEC Manager job posting indicates that the responsibilities of the manager include addressing employee concerns and counseling Amtrak management employees in employment practices. To accomplish those tasks, the job posting further provides that an applicant should be well versed in Amtrak policies and procedures, and be able to manage according to established Amtrak guidelines and sound administrative practices. Bacchus's testimony merely fleshed out the importance of these responsibilities and qualities to the job for which plaintiff applied, and did not add additional and hidden qualification requirements. Plaintiff's assertion that Bacchus's factors served as impermissible bases for evaluating her candidacy—because the NEC job posting did not explicitly indicate that knowledge of the organization and networking were important to a candidate's evaluation—is unavailing. The job posting and Bacchus's testimony regarding the NEC Manager position do not permit an inference of discriminatory motive or demonstrate pretext.

### 2. Bacchus's and Ramirez's consideration of race and gender

Plaintiff also argues that pretext is demonstrated because Bacchus and Ramirez considered the issue of gender and race diversity during the selection process, therefore providing an inference that plaintiff's race and gender became disqualifying factors for the NEC Manager position. Ramirez testified during his deposition that he and Bacchus hoped to have a "diverse group" of managers between the NEC, Intercity and West manager positions because "it would help the diversity issue ... taking into account gender and race and national origin." (Walfoort Decl., Ex. 13 at 124–25.) Although such a discussion between Ramirez and Bacchus, if it occurred, may have exhibited the lawful goal of achieving workplace diversity through an open and fair application and interview process, it could also suggest that an applicant's race, gender and/or national origin became, as plaintiff posits, a disqualifying characteristic for the NEC Manager position.

Plaintiff does not rely solely on Ramirez's recollection of his discussion with Bacchus on the issue of diversity to challenge Amtrak's proffered explanation for its failure to hire plaintiff for the NEC Manager position. Plaintiff argues that Bacchus' testimony in her deposition that diversity was not an issue and that the topic never came up in discussions with Ramirez (*see id.*, Ex. 16 at 60), constitutes a material inconsistency which suggests that Bacchus is attempting to gloss over the use of race and gender as disqualifying factors in the NEC Manager selection process. Plaintiff notes in advancing her pretext argument that on January 7, 2000— two weeks before Amtrak notified plaintiff that she had not been selected for the

NEC Manager position—Amtrak offered the Intercity Manager position to Janet Harvey and the West Manager position to Carol Brown. Harvey and Brown are African–American females. If Ramirez's deposition testimony that race and gender were taken into account when filling the SBU manager positions is credited, an inference could be drawn that because two African–American females were selected for the Intercity and West manager positions before any decision had been made regarding the NEC Manager position, that Bacchus decided not to hire plaintiff for the remaining NEC Manager position because she was an African–American female. As is discussed below, such an inference could draw added support from the inconsistent accounts of Amtrak managers regarding the NEC Manager selection process, and Amtrak's failure to comply with its own hiring policies.

### 3. Bacchus's selection process and offering the position to two white male employees

 According to Bacchus, she and Ramirez met and discussed the NEC Man-ager candidates only "[a]t the end of all of [the interviews]." [38] (Ford Decl., Ex. 13 at 65.) She testified that during that meeting, she and Ramirez discussed her impressions of each candidate and what her intentions were with respect to making a job offer (*see id.* at 67), and that Ramirez "certainly did not have an objection with [her] choice for selection." (*Id.* at 68.) Bacchus's testimony that she would have to approve any job offer for the NEC Manager position (*see id.* at 75), and that only one candidate, Barry Warner, received an offer for the position (*see id.* at 74), evinces a belief on her part that she met with Ramirez only once, which by necessity would have had to occur sometime after February 11, 2000 when she and Ramirez interviewed the last candidate—Warner. (*See* Ford Decl., Ex. 15.)

Amtrak denied plaintiff the NEC Manager position on January 21, 2000 (*see* Ford Decl., Ex. 16), at least three weeks before Bacchus and Ramirez could have met, under Bacchus's timeline, to discuss all of the candidates to make a selection. [39]

---

[38]. Plaintiff suggests that Bacchus and Ramirez treated her unfairly and differently during the interview process "based on the fact that the interview was very, very different from the behavioral based interviewing that [plaintiff] had done throughout [Amtrak] for senior managers[.]" (Ford Decl., Ex. 5 at 199.) "An employer's failure 'to follow its own regulations and procedures, alone, may not be sufficient to support' the conclusion that its explanation for the challenged employment action is pretextual." *Fischbach,* 86 F.3d at 1183 (quoting *Johnson v. Lehman,* 679 F.2d 918, 922 (D.C.Cir.1982)). Plaintiff neither offers comparative evidence to support her allegation that the NEC Manager position interview process deviated from some company-wide standard, nor refutes Bacchus's testimony that she and Ramirez followed the same form and asked the same questions of each candidate. Plaintiff's unsupported allegation of unfair treatment due to the type of interview conducted does not support an inference of discriminatory motive.

[39]. There is some evidence that Ramirez and Bacchus may have met at some point before sending plaintiff the January 21, 2000 letter denying her the NEC Manager position. Ramirez testified during his deposition that he discussed with Bacchus the fact that plaintiff had been terminated from her HR Consultant position on January 7, 2000 (*see* Walfoort Decl., Ex. 13 at 34), and that he thought it would be a favor to plaintiff to notify her that she had not been selected for the position. (*See id.*) Ramirez's testimony is at odds with Bacchus's recollection regarding the timing of any discussions regarding any of the candidates. When asked during her deposition to confirm her testimony that her discussions with Ramirez occurred after all of the interviews been completed, Bacchus replied, "[o]h yes. Not after each one." (Ford Decl.,

Further, Ramirez sent a letter to Robert Dougherty on February 18, 2000 which expressed regret that Dougherty was unable to accept an offer for the NEC Manager position. (*See* Walfoort Decl., Ex. 34.) Ramirez's letter strongly implies, contrary to Bacchus's testimony that only Warner received an offer, that there was an attempt to fill the position with at least one other white male candidate. This inconsistency could lead to an inference that plaintiff's race and gender were disqualifying factors in her attempt to obtain the NEC Manager position because Bacchus did not want to fill the last SBU manager position with another African–American female.[40]

### 4. Amtrak's failure to adhere to its hiring policy

Plaintiff also argues that pretext is established because Amtrak did not follow its established policies and procedures with respect to management position applications in filling the NEC Manager position. Amtrak's policy for applying for posted management positions states that "[a] management employee may not apply for a posted management position if he or she has not been in his or her current position for at least one year." (Ford Decl., Ex. 48.) "However, if these restrictions create a hardship for Amtrak, the employee's supervisor AND the Personnel Department may grant an exception to this rule." (*Id.*)

(emphasis in original.) According to Ramirez, this one-year policy is fairly consistently followed, and the exception is applied when an "individual's qualifications are ... so premiere or so eminent that it would be a loss if [Amtrak] didn't move the person into the position or promote the person into a position." (Walfoort Decl., Ex. 13 at 65.) Ramirez testified that the decision to grant an exception is made in writing by the corporate vice-president of human resources. (*See id.*)

Amtrak admits that Warner had been in his earlier position for less than one year at the time he applied for and Amtrak ultimately transferred him into the NEC Manager position (*see* Defs.' Reply at 19), but suggest that Warner's supervisor granted him an exception to the one-year policy. (*See* Ford Decl., Ex. 49.) However, Amtrak does not also present evidence that the then-corporate vice-president of human resources, Lorraine Green, also granted such an exception in writing. Nor does Amtrak establish that Bacchus and Ramirez considered Warner's qualifications to be "so premiere or so eminent" as to warrant the application of the exception. This gap in proof, in conjunction with the record evidence discussed above which could lead to an inference that Bacchus and Ramirez considered plaintiff's race and gender to be a disqualifying factor for the NEC Manager position, creates a genuine issue of material fact as to whether, in

---

Ex. 13 at 65). Such an additional inconsistency could produce a credibility issue for a jury to resolve. Further, although there may be an innocent explanation for the repeated inconsistencies—such as Bacchus's simple failure to recollect the details and timing of her interactions with Ramirez regarding the NEC Manager position—Amtrak has not offered any such explanation for the material inconsistencies.

**40.** It is also undisputed that before Dougherty and Warner were interviewed, three of the

other four candidates interviewed by Bacchus and Ramirez included an African–American male Amtrak employee and two African–American female Amtrak employees (*see* Ford Decl., Ex. 15), all of whom were chosen as meeting minimum qualifications for the NEC Manager position before being interviewed. None of them received an offer for the position. A white female applicant withdrew her application after interviewing for the position (*see id.*, Ex. 13 at 48), and thus was not considered by Bacchus.

hiring Warner, Bacchus sought to fill the NEC Manager position with a white male applicant without regard to, and in contravention of, Amtrak hiring policy.

■ Viewing the record in the light most favorable to plaintiff, genuine issues of material fact exist regarding the role race and gender played in Bacchus's decision not to offer plaintiff the NEC Manager position. A reasonable jury could determine that the inconsistencies between Bacchus's testimony and other record evidence demonstrate that Amtrak's proffered legitimate and non-discriminatory justification for not hiring plaintiff for the NEC Manager position is mere pretext for unlawful race and gender discrimination in violation of Title VII and § 1981. Amtrak's motion for summary judgment on plaintiff's claim of race and gender discrimination for failure to hire her in Counts I and III therefore will be denied.[41]

## B. *Age discrimination under the ADEA*

■ Plaintiff alleges in Count II that Amtrak denied her the NEC Manager position because of her age in violation of the ADEA. "To establish a prima facie case under the ADEA, for a claim involving a failure to hire, the plaintiff must demonstrate that (1) she is a member of the protected class (*i.e.*, over 40 years of age); (2) she was qualified for the position for which she applied; (3) she was not hired; and (4) she was disadvantaged in favor of a younger person." *Teneyck v. Omni Shoreham Hotel,* 365 F.3d 1139, 1155 (D.C.Cir.2004). Plaintiff has demonstrated a *prima facie* case here. She was over 40 at the time she was not hired for the NEC Manager position, she applied for the position and met its minimum qualifications, she was not hired, and she was disadvantaged when Amtrak hired Warner instead of her into the position.

Plaintiff still must offer proof that Amtrak's nondiscriminatory explanation that plaintiff was not offered the NEC Manager position because of her weak interview was mere pretext for unlawful age discrimination. *See Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). There is, however, an absence of any evidence that age was a factor considered by Bacchus and Ramirez in the interview and selection process for the NEC Manager position. Indeed, plaintiff admits that there is "*no*

**41.** Plaintiff's claims of race discrimination against Green and Porter with regard to Bacchus's failure to hire her for the NEC Manager position are not supported by any evidence. Plaintiff's apparent bases for alleging § 1981 racial discrimination claim against Green is that Green was Vice–President of Human Resources and therefore "would certainly be aware of the organizational structure within her department, the races ... of those persons that were being hired, and as a result of that knowledge, she would be discriminatory in her actions." (Ford Decl., Ex. 5 at 149.) There is no evidence in the record that demonstrates Green was involved in, let alone aware of, any aspects of the NEC Manager hiring process. Indeed, Bacchus testified that she was the decisionmaker and needed only approval from her supervisor Gerri Hall, which Bacchus characterized as just "a for-

mality." (Walfoort Decl., Ex. 16 at 71–72.) Moreover, plaintiff offers no evidence that Porter had any role in the decision not to offer plaintiff the NEC Manager position, and concedes that she had no reason for naming Porter as a defendant with respect to her discriminatory failure to hire claims. (*See* Ford Decl., Ex. 5 at 204 (plaintiff's testimony that she "would not accuse [Porter] of being personally responsible for not giving [her] that [NEC Manager] job").) Thus, although plaintiff can maintain § 1981 and DCHRA claims against individual defendants (*compare* Defs.' Mot. to Dismiss at 4–12, *with* Pl.'s Opp'n Mot. to Dismiss at 4–10), she has no bases for doing so here. Summary judgment therefore will be granted to Green and Porter with respect to plaintiff's claims of a discriminatory failure to hire her in Counts I and V of her amended complaint.

evidence to show that Bacchus was aware of the personnel records that reflected" plaintiff's birth date (*see* Pl.'s Opp'n at 37 (emphasis in original)), and Bacchus testified that she did not know and did not care what plaintiff's age was at the time she interviewed plaintiff for the NEC Manager position. (*See* Ford Decl., Ex. 13 at 74.) Bacchus explained that she "didn't know [plaintiff] very well," so "[t]here was no need for [her] to think about [plaintiff's age]." (*Id.*) Because plaintiff has failed to rebut Amtrak's age-neutral justification with facts from which a reasonable jury could conclude that plaintiff has sustained her ultimate burden of proving intentional age discrimination, Amtrak's motion for summary judgment on plaintiff's claim of age discrimination for failure to hire her in Count III therefore will be granted.

### C. *Perceived disability under the ADA*

In Count IV, plaintiff alleges that Amtrak discriminated against her on the basis of a perceived disability when Bacchus denied her the NEC Manager position. (*See* Pl.'s Am. Compl. ¶ 38.) Plaintiff appears to have abandoned this claim since she did not respond to Amtrak's argument that "Bacchus was not aware of any of plaintiff's alleged physical problems." (*Compare* Defs.' Mem. Supp. Summ. J. at 25–26, *with* Pl.'s Opp'n at 38–45.) Indeed, it is undisputed that when plaintiff interviewed with Bacchus and Ramirez for the NEC Manager position, plaintiff did not appear to have any physical problems (*see* Ford Decl., Ex. 13 at 78), and plaintiff did not indicate that she would have any problems with travel or fulfilling the NEC Manager job requirements. (*See id.* at 77.) Because plaintiff cannot demonstrate a *prima facie* case that Bacchus or Ramirez regarded her as disabled, or more importantly, that Bacchus rejected her application on the basis of a perceived disability, Am-

trak is entitled to judgment as a matter of law on this claim.

### D. *DCHRA*

As is discussed above, the sufficiency of claims brought under the DCHRA is consistently tested using the analytical framework announced in federal court decisions under federal anti-discrimination statutes. Accordingly, because plaintiff has presented enough evidence to create a genuine issue of material fact with respect to her claims of race and gender discrimination for failure to hire her in Counts I and III, she also has presented enough evidence to withstand summary judgment with respect to her claims of race and gender discrimination for failure to hire her under the DCHRA in Count V. To the extent plaintiff's complaint seeks to raise age and perceived disability discrimination for failure to hire claims under the DCHRA, she has failed to carry her burden of producing evidence to support those claims. Amtrak's motion for summary judgment therefore will be denied with regard to plaintiff's claims of race and gender discrimination for failure to hire her in Count V, and will be granted with respect to plaintiff's claims of age and perceived disability discrimination for failure to hire her in Count V.

### CONCLUSION AND ORDER

Title VII provides no cause of action against individual employees. To the extent plaintiff's complaint asserts a Title VII claim against Green and Porter, their motion to dismiss the claim as to them will be granted. Since Green and Porter played no role in Amtrak's decision to not hire plaintiff as the NEC manager, Green and Porter's motion for summary judgment will be granted as to all claims against them in Counts I and V regarding the failure to hire. Plaintiff has placed

sufficient material facts in dispute with regard to her Title VII, § 1981 and the DCHRA claims of suffering race and gender discrimination when Amtrak terminated her and later failed to hire her for the NEC position. Amtrak's motion for summary judgment will be denied with respect to plaintiff's claims of race and gender discrimination in Counts I, III and V, as will Green and Porter's with respect plaintiff's claim of discrimination in termination on the ground of race under § 1981 in Count I and on the grounds of race and gender in Count V. Plaintiff has not placed any material issues in dispute with respect to her claims of age and perceived disability discrimination when she was terminated and not re-hired. Summary judgment will be granted to Amtrak on Counts II and IV, and to all defendants on plaintiff's age and perceived disability claims alleged in Count V. Accordingly, it is hereby

ORDERED that Green's and Porter's motion [# 16] to dismiss Counts I and V under Federal Rule of Civil Procedure 12(c) be, and hereby is, GRANTED in part and DENIED in part. To the extent Count I asserts a Title VII cause of action against Green and Porter, that cause of action is dismissed. The motion is otherwise denied. It is further

ORDERED that defendants' motion for summary judgment [# 55] be, and hereby is, GRANTED in part and DENIED in part. Amtrak's motion is GRANTED with respect to Counts II, IV and the age and perceived disability discrimination claims in Count V; and DENIED with respect to Counts I and III and the claims of race and gender discrimination in Count V. Green and Porter's motion for summary judgment is DENIED with respect to the § 1981 termination claim in Count I and the claims of race and gender discrimination in termination in Count V; and GRANTED with respect to the age and

perceived disability discrimination in termination claims in Count V, and the failure to hire claims of Counts I and V.